## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE STEIN

07 CV 2902

| | |
|---|---|
| The JAY PETER KAUFMAN REVOCABLE TRUST, On behalf of Itself and All Others Similarly Situated, | Civ. No. |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| NEW CENTURY FINANCIAL CORPORATION, BRAD A. MORRICE, ROBERT K. COLE, MARYLIN A. ALEXANDER, HAROLD A. BLACK, FREDRIC J. FORSTER, EDWARD F. GOTSCHALL, DONALD E. LANGE, MICHAEL M. SACHS, RICHARD A. ZONA, PATTI M. DODGE, DAVID EINHORN, BEAR, STEARNS & CO., INC., MORGAN STANLEY & CO., INC., STIFEL NICOLAUS & COMPANY, INCORPORATED, and JEFFRIES & COMPANY, INC., | **CLASS ACTION COMPLAINT** |
| Defendants. | |



RECEIVED
APR 10 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## BASIS OF THE ALLEGATIONS

Plaintiff, the Jay Peter Kaufman Revocable Trust ("Plaintiff"), alleges the following based upon information and belief and the investigation by Plaintiff's counsel (except for paragraphs 1 and 15, which are alleged based upon the personal knowledge of the Plaintiff) which included, *inter alia*, a review of the following information: the Defendants' public documents; information concerning the Company and announcements made by the Defendants and/or their employees or other representatives; filings with the United States Securities and Exchange Commission ("SEC") and the United States Bankruptcy Court for the District of Delaware; press releases published by and concerning New Century Financial Corporation ("New Century" or the "Company") and its business, financial and operational results; securities and credit analysts' reports and advisories about the Company; newspaper articles and reports from the media; and interviews with former employees familiar with many of the facts and circumstances surrounding the allegations set forth below. Plaintiff believes that upon further discovery, substantial additional evidentiary support will be uncovered which will support the allegations set forth herein.

## NATURE AND SUMMARY OF THE ACTION

2.      This class action seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and is brought by Plaintiff, a purchaser of New Century's 9.75% Series B Cumulative Redeemable Preferred Stock ("Series B Preferred"), on behalf of itself and all those who purchased or otherwise acquired New Century Series B Preferred stock between August 15, 2006 and February 7, 2007, inclusive (the "Class Period") pursuant and/or traceable to New Century's offering of said Series B Preferred stock (the "Offering").

3.      The Company's Offering Documents (defined below on page 15, footnote 2) in connection with the Series B Preferred Offering were materially false and misleading. At the time of the Effective Date of the Offering, the Defendants concealed from and failed to

disclose material adverse facts concerning, *inter alia*, the Company's financial and business condition and well-being. Specifically, Defendants failed to disclose at least the following material adverse facts and conditions that threatened the Company's survival and the value of its shareholders' investments:

(1)    that the Company's reserves for loan losses were grossly insufficient;

(2)    that New Century failed to timely write down for residual interests in securitizations;

(3)    that the Company did not properly account for early-payment default and loan repurchase loss allowances;

(4)    that New Century was operating in an extremely risky and volatile industry without adequate internal and financial or business controls or monitors, and specifically lacked, among other things, any adequate policies, practices, procedures or safeguards for, *inter alia*, properly evaluating the creditworthiness of borrowers or evaluating or managing the increased risks associated with the segments of the mortgage industry in which New Century operated;

(5)    that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principals ("GAAP"); and

(6)    that, as a result of the these and other material omissions and misrepresentations, the Offering Documents were materially false and misleading.

4.    Unbeknownst to the Plaintiff and other Class members, prior to, during and after the Offering, the internal business and financial environment and structure at New Century was in a severe state of deterioration. Indeed, the fact that it is necessary for New Century's reported financial results for the first two fiscal quarters of 2006 to be restated, a time period covered by the relevant Offering documents, and that the Company disclosed that these financial statements should not be relied upon (and are thus essentially worthless) should be deemed an admission

- 2 -

that they were materially false and misleading when originally issued. (APB No.20, ¶¶7-13; SFAS No. 154, ¶25). This is tantamount to an admission of liability under Section 11 of the Securities Act here.

5.      Further, as set forth in greater detail below, and as reported by former Company employees and insiders with direct knowledge of the facts and events described herein, New Century's lending practices were riddled with the following serious problems:

(a)      The Company was obsessed with the volume of loan production, at the expense of the quality of loans made. Interviews with former employees revealed that it was routine at New Century to stretch and/or make exceptions to the Company's lending guidelines to qualify borrowers for loans who would otherwise have only qualified for smaller loans, or would not have qualified for any loan at all. While certain of the Offering Documents (such as New Century's August 15 Prospectus Supplement, and the May 6, 2005 Prospectus which it attaches and incorporates by reference) claimed that it "originate[d] and purchase[d] mortgage loans on the basis of the borrower's ability to repay the loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV," these criteria were at best only preliminary, and were routinely ignored or altered to approve risky loans. As indicated by these former employees, sales and volume considerations, and meeting or exceeding loan quotas, ruled the day at New Century.

(b)      In fact, the Company employed lax lending guidelines, which were not strengthened until late 2006 and early 2007. The eventual strengthening of these guidelines just before the Company announced its restatement in February 2007 finally, and belatedly, resulted in a "tremendous" decline in loans and loan applications at New Century because these

- 3 -

applications no longer qualified under the newly tightened guidelines. While the Company had claimed in the Offering Documents (specifically, in its May 6, 2005 Prospectus, attached to and incorporated by reference in its August 15, 2006 Prospectus Supplement) to have "developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to effectively manage the potentially higher credit risks associated with this segment of the mortgage industry," according to former employees this "sophisticated" and "comprehensive" process was in fact based on routine factors such as potential borrowers' credit scores, which were used industry-wide and were in any event routinely disregarded at New Century for the sake of approving otherwise unqualified loans.

(c )     New Century's payment to loan officers was based overwhelmingly upon incentive commissions, and through an incentive structure which further encouraged loan officers to write more, larger and riskier loans by awarding commissions amounting to higher and higher percentages of the fees charged for each new loan written. For example, a loan officer might be paid no commission for the first loan generated (commission would cover operating expenses such as office space), but then receive a 12 percent commission for the second loan; an 18 percent commission for the third loan; and a 36 percent commission for the fourth loan he or she generated, up to as high as a commission of 50 percent of all fees collected in connection with a particular loan.

(d)     Loans that were not yet "funded" or "closed" were improperly counted towards month-end tallies of completed loans, a practice equivalent to "pulling revenue forward," which created a skewed financial picture of the Company for any given month.

6.     New Century revealed the truth about its deteriorated and out-of-control financial and business condition on February 7, 2007, well after the Offering. On that day, after the

- 4 -

market had closed, the Company announced that it would be forced to restate its financial results for the full year 2006. In this connection, New Century confessed that it has materially misstated its financial and that the financial statements for the *entire year 2006* were not prepared in accordance with GAAP and were essentially worthless and could not be relied upon.

7. On the news of this impending restatement, the share price of the Company's Series B Preferred stock plunged over 23%, from $24.95 per share on February 7, 2007 to $19.04 several days later on February 12, 2007.

8. The fallout from the disclosure of the truth about the Company's financial condition and business practices has continued to damage the Company. since the disclosure, New Century's stock has been suspended from trading on and de-listed from the NYSE. The Company also delayed indefinitely the announcement of its fourth quarter and full year 2006 financial results, and announced that its lenders have completely terminated its access to any financing and accelerated New Century's loan repurchase obligations under its respective agreements with them.

9. The Company's business and lending practices, previously unknown to investors, have also come under widespread regulatory scrutiny. On March 14, 2007, according to a *Reuters* article, the Ohio Attorney General reportedly obtained a court order effectively prohibiting New Century from doing business in that state, and accusing the Company of violating Ohio's Consumer Sales Practices Act, Mortgage Loan Act, and Mortgage Brokers Act. Cease-and-desist orders have also reportedly been issued by regulators in New York, New Jersey, Massachusetts, and New Hampshire preventing New Century from taking new loans in those states. Both the SEC and the U.S. Department of Justice have launched investigations into accounting irregularities and/or other misconduct at New Century.

- 5 -

10.    Finally, after weeks of speculation that it would ultimately do so, the Company that had promoted itself as "A New Shade of Blue Chip" filed for Chapter 11 bankruptcy on April 2, 2007 in the United States District Court for the District of Delaware.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

12.    This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §§1331 and 1337.

13.    Venue is proper in this District pursuant to Section 22 of the Securities Act, as many of the acts charged herein occurred in substantial part in this District. Venue is also proper in this judicial district pursuant to 28 U.S.C. §1391 because several of the defendants, including the Underwriter Defendants, are headquartered and/or do substantial business within this District.

14.    In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, *inter alia*, the mails and telephonic communications and the facilities of the NYSE, a national securities exchange.

## THE PARTIES

### The Plaintiff

15.    Plaintiff, the Jay Peter Kaufman Revocable Trust, purchased New Century Series B Preferred Stock, as set forth in the certification attached hereto and incorporated herein by reference, pursuant and/or traceable to the Company's public offering, and was damaged thereby. Plaintiff brings this action on behalf of a Class of those who purchased or otherwise

- 6 -

acquired New Century Series B Preferred stock pursuant and/or traceable to the Offering during the Class Period.

## Defendant New Century and the Individual Defendants

16.     Defendant New Century is a corporation incorporated under the laws of Maryland and has principal business offices at 18400 Von Karman Avenue, Suite 1000, Irvine, CA. New Century is a REIT,[1] and is focused on the business of "sub-prime lending." Specifically, New Century makes mortgage loans to persons who are generally unable to access credit from traditional financial institutions because they do not satisfy credit, documentation or other underwriting standards mandated by these traditional mortgage lenders and loan buyers, which typically lend only to more creditworthy borrowers. The Company originates and purchases mortgage loans through two divisions: the Wholesale Division and the Retail Division. On April 2, 2007, New Century filed a petition under Chapter 11 of the United States Bankruptcy Code. The now-bankrupt New Century continues to tout itself as "A New Shade of Blue Chip," a description it has apparently even had trademarked. New Century is afforded certain protections under the United States Bankruptcy Code and is named as a defendant herein to preserve any and all claims that Plaintiff and the other Class members may have against the Company.

17.     Defendant Brad A. Morrice served as a director of the Company at relevant times hereto, has been a director since 1995, and has been the Vice Chairman of the Board of Directors

---

[1] REIT's are publicly traded companies that typically make investments in and/or manage real estate and pay rental income and profits to shareholders, and/or (in the case of "Mortgage REITs") invest in mortgage loans secured by real estate. These secured mortgage loans are typically either originated or underwritten by the REIT, or purchased by the REIT from a secondary market. The funds invested by REITs typically come from equity capital invested by shareholders or consists of debt borrowed from other lenders.

- 7 -

since December 1996. Defendant Morrice was also, at all relevant times, the Company's President and CEO, a position he assumed on July 1, 2006. Defendant Morrice has been with the Company for many years and has held a variety of senior executive management positions with New Century during that time. From January 2001 to July 2006 he was the Company's Chief Operating Officer ("COO"). Mr. Morrice also served as the Company's General Counsel from December 1995 to December 1997 and its Secretary from December 1995 to May 1999. Defendant Morrice signed the August 18, 2006 Registration Statement and the April 26, 2005 Registration Statement in connection with the Offering.

18.     Defendant Robert K. Cole ("Cole") was New Century's Chairman of the Board at relevant times hereto, from December 1995 through December 2006, and also held the position of CEO from December 1995 to July 1, 2006, when Defendant Morrice took over as CEO. Defendant Cole signed the April 26, 2005 Registration Statement.

19.     Defendant Edward F. Gotschall ("Gotschall") is a co-founder of the Company and has served as a director of the Company at relevant times hereto, since November 1995, and has been a Vice Chairman of the Board since December 1996. Defendant Gotschall has also held a variety of senior executive management positions with the Company. In July 2004 he was appointed Vice Chairman-Finance of the Company after serving as its CFO since August 1998, and its COO-Finance/Administration from December 1995 to August 1998. Defendant Gotschall signed the April 26, 2005 Registration Statement.

20.     Defendant Patti M. Dodge ("Dodge") is currently the Executive Vice President, Investor Relations, but was at relevant times hereto New Century's CFO, having held that position from July 2004 to November 2006. Defendant Dodge signed the April 26, 2005 Registration Statement.

- 8 -

21.     Defendant Marilyn A. Alexander ("Alexander") served as a director of the Company at relevant times hereto, and has been a director since May 2005. Defendant Alexander is the Chairwoman of the Board's Finance Committee, and also serves on the Board's Governance, Governance & Nominating, and Public & Community Affairs Committees.

22.     Defendant Harold A. Black, Ph.D. ("Black") served as a director of the Company at relevant times hereto, since June 2004. Defendant Black is the Chairman of the Board's Public & Community Affairs Committee, and also serves on the Board's Governance & Nominating, and Compensation Committees. Defendant Black signed the April 26, 2005 Registration Statement.

23.     Defendant Fredric J. Forster ("Forster") became the Chairman of the Board of Directors in January 2007, has served as a director of the Company at  relevant times hereto, since July, 1997. Defendant Forster is a member of the Board's Governance & Nominating, and Compensation Committees. Defendant Forster has also been designated by the Company as the "Lead Director." Defendant Forster signed the April 26, 2005 Registration Statement.

24.     Defendant Donald E. Lange ("Lange") served as a director of the Company at relevant times hereto, since November of 2002. Defendant Lange is the Chairman of the Board's Compensation Committee, and also serves on the Board's Audit and Governance & Nominating Committees. Defendant Lange signed the April 26, 2005 Registration Statement.

25.     Defendant Michael M. Sachs ("Sachs") served as a director of the Company at relevant times hereto, and since November 1995. Defendant Sachs is the Chairman of the Board's Audit Committee, and also serves on the Board's Compensation and Finance Committees. Defendant Sachs is a CPA and an attorney. Defendant Sachs signed the April 26, 2005 Registration Statement.

- 9 -

26.    Defendant Richard A. Zona ("Zona") served as a director of the Company at relevant times hereto, since June 2000. Defendant Zona serves on the Board's Audit and Finance Committees. Defendant Zona is a CPA, has been Chairman and CEO of Zona Financial, a private financial advisory firm, since 2000, and was formerly a partner with Ernst & Young LLP. Defendant Zona signed the April 26, 2005 Registration Statement.

27.    Defendant David Einhorn ("Einhorn") served as a director of the Company at relevant times hereto, from March, 2006 until his resignation from the Board effective March 7, 2007. Defendant Einhorn is the founder of Greenlight Capital, a hedge fund which is one of New Century's largest shareholders, with an approximate 6.3 percent stake in the Company. The Company appointed Defendant Einhorn as a director in March 2006 in connection with the settlement of a proxy dispute.

28.    Defendants Morrice, Cole, Alexander, Black, Forster, Gotschall, Lange, Sachs, Zona, Dodge and Einhorn, as identified in ¶¶ 16-26 above, are collectively referred to hereinafter as the "Individual Defendants." Each director is statutorily liable for the materially misleading misstatements and material omissions in the Offering Documents. In addition, because of their management and/or directorial positions with the Company and their ability to make public statements on behalf of New Century, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) the Company to engage in the conduct complained of herein.

**The Underwriter Defendants**

29.    Defendant Bear, Stearns & Co., Inc. ("Bear Stearns"), is a leading global investment banking, securities trading and brokerage firm headquartered at 383 Madison Avenue, New York, New York 10179. Bear Stearns advertises on its website that it "help[s]

corporations, institutions, governments and individuals reach their financial objectives." Defendant Bear Stearns is a subsidiary of Bear Stearns Companies, Inc., the seventh largest securities firm in the world ranked by total capital, and publicly traded company with reportedly over $70 billion in total capital and total assets of approximately $335 billion. At the time of the Offering, New Century had an $800 million line of credit, with an outstanding balance of $567.2 million, with Bear Stearns Mortgage Capital Corporation, and affiliate of Bear, Stearns. Pursuant to the August 15 Prospectus Supplement, Bear, Stearns underwrote 750,000 shares of New Century Series B Preferred stock in connection with the Offering.

30.     Defendant Morgan Stanley & Co., Inc. (Defendant "Morgan Stanley") has headquarters at 1585 Broadway, New York, New York 10036. Morgan Stanley & Co., Inc's parent company Morgan Stanley advertises itself as "a leading global financial services firm providing a wide range of investment banking, securities, investment management, wealth management and credit services" with "clients worldwide including corporations, governments, institutions and individuals from more than 600 offices in 30 countries." At the time of the Offering, New Century had an $3 billion credit facility, with an outstanding balance of $1.4 billion, with Morgan Stanley Bank and Morgan Stanley Mortgage Capital Inc., affiliates of Defendant Morgan Stanley. Pursuant to the August 15 Prospectus Supplement, Morgan Stanley underwrote 750,000 shares of New Century Series B Preferred stock in connection with the Offering.

31.     Defendant Stifel Nicolaus & Company, Incorporated ("Stifel Nicolaus"), is a subsidiary of the Stifel Financial Corporation, and advertises itself as a "full service brokerage and investment banking firm" headquartered at One Financial Plaza, 501 North Broadway, St. Louis, Missouri  63102, with 121 offices in 27 states and the District of Columbia as well as

- 11 -

three European offices. Stifel Nicolaus is reportedly listed on the NYSE under the symbol "SF". Pursuant to the August 15 Prospectus Supplement, Stifel Nicolaus underwrote 380,000 shares of New Century Series B Preferred stock in connection with the Offering.

32.    Defendant Jeffries & Company, Inc. ("Jeffries & Co.) advertises itself as a "global investment bank and institutional securities firm focused on growing and mid-sized companies and their investors," and a leading M&A and restructuring advisor and underwriter to mid-sized and growing companies," with corporate headquarters at 520 Madison Avenue, 12th Floor, New York, New York 10022. Pursuant to the August 15 Prospectus Supplement, Jeffries & Co. underwrote 120,000 shares of New Century Series B Preferred stock in connection with the Offering.

33.    Defendants Bear Stearns, Morgan Stanley, Stifel Nicolaus, and Jeffries & Co, are collectively referred to herein as the "Underwriter Defendants." Bear Stearns and Morgan Stanley acted as joint bookrunners, and Stifel Nicolaus and Jeffries & Co. acted as co-managers with respect to the Offering.

34.    The Underwriter Defendants are liable for the materially false and misleading statements and material omissions contained in the Offering Documents.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure ["FRCP"] 23(a) and 23(b)(3) on behalf of itself all those who purchased or otherwise acquired New Century Series B Preferred stock during the Class Period, which stock was purchased and/or acquired pursuant to and/or traceable to the Offering. Excluded from the Class are Defendants herein, members of the Individual Defendants' immediate families, and any person, firm, trust, corporation, officer, director or other individual or entity in which any

- 12 -

Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

(1)    The members of the Class are so numerous that joinder of all members is impracticable. New Century issued approximately 2.3 million shares of Series B Preferred stock to members of the investing public in the Offering, and as of February 7, 2007 there were approximately that many shares outstanding. Subsequent to the Offering, and throughout the Class Period, the Company's Series B Preferred Stock was listed and actively traded on the NYSE under the symbol "NEW PrB." The precise number of Class members is unknown to plaintiff at this time but is believed to number in the thousands, at a minimum. In addition, the names and addresses of the Class members can be ascertained from the books and records of New Century and/or its transfer agent. Moreover, notice can be provided to such record owners by a combination of published notice and first-class mail using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

36.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel highly experienced in class action litigation under the federal securities laws to further ensure such protection, and intends to prosecute this action vigorously.

37.    Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

38.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

39.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(i)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(ii)    Whether the Registration Statement and other Offering Documents omitted or misrepresented material facts; and

(iii)    The extent of damages sustained by members of the Class and the appropriate measure of such damages.

## SUBSTANTIVE ALLEGATIONS

### The Materially False and Misleading Statements in the Offering Documents[2]

40.    On or about April 26, 2005, New Century filed a shelf registration for the sale of securities on Form S-3 with the SEC pursuant to Rule 415, triggering undertakings under Item 512(a) of Regulation S-K.

41.    Then, on or about August 16, 2006, New Century filed the Form 424B5 Prospectus Supplement dated August 15, 2006 (the "August 15 Prospectus Supplement") with

---

[2] The term "Offering Documents" as used herein refers to the following materials described or referred to herein: the April 26, 2005 Shelf Registration on Form S-3; the May 5, 2006 Prospectus; the August 15, 2006 Prospectus Supplement; the August 18, 2006 8-K concerning the agreement with the Underwriter Defendants; the August 18, 2006 Registration Statement; and all documents and information incorporated by reference in any of these aforementioned documents.

- 14 -

the SEC in connection with the Offering.  The August 15 Prospectus Supplement stated that the Company was offering two (2) million shares of the Series B Preferred Stock, at a public offering price of $25.00 per share, for total proceeds of approximately $50 million.  That Prospectus Supplement listed four underwriters of the Offering,  Underwriter Defendants Bear Stearns; Morgan Stanley; Stifel Nicolaus; and Jeffries & Company.  Bear Stearns and Morgan Stanley acted as joint bookrunners, and Stifel Nicolaus and Jeffries & Co. acted as co-managers with respect to the Offering.  According to the August 15 Prospectus Supplement, the Underwriter Defendants were collectively paid a gross underwriting fee of 3.15%, or $1.575 million ($0.7875 per share of Series B Preferred issued) in connection with the Offering.

42.     On or about August 18, 2006, New Century filed a Form 8-K dated August 15, 2006 disclosing that the Company had entered into an underwriting agreement with Defendants Bear Stearns and Morgan Stanley, as representatives of the several underwriters named in Schedule A thereto, relating to the sale of 2,000,000 shares of Series B Preferred Stock on August 15, 2006. As disclosed in New Century's August 15, 2006 Form 8-K:  "All shares of Series B Preferred Stock under the Underwriting Agreement are being sold under the Company's Registration Statement on Form S-3, which was filed on April 27, 2005, pursuant to a Prospectus dated May 6, 2005, as supplemented by the [August 15, 2006] Prospectus Supplement filed with the [SEC] on August 16, 2006."

43.     Also on or about August 18, 2006, New Century filed a Registration Statement on Form 8-A with the SEC, also in connection with the Offering.  This Registration Statement was signed by Brad A. Morrice ("Morrice"), then the President and CEO of New Century.  The August 18 Registration Statement provided that the Series B Preferred stock was to be

- 15 -

registered on the New York Stock Exchange, Inc. ("NYSE").  This August 18 Registration

statement also expressly referred investors to, and incorporated by reference, the description of

the Series B Preferred stock contained in the August 15 Prospectus Supplement.

44.    The August 15, 2006 Prospectus Supplement attached the original May 6, 2005

Prospectus pursuant to which the Series B Preferred Stock was issued.  Notably, the August 15,

2006 Prospectus Supplement stated that it "contain[ed] two parts.  The first part is this [August

15] [P]rospectus [S]upplement, . . . [t]he second part is the accompanying [May 6, 2005]

[P]rospectus . . . You should read this entire [P]rospectus [S]upplement, as well as the

accompanying [P]rospectus, and the documents incorporated by reference in each . . ."

45.    The May 6, 2005 Prospectus (which was attached to, and incorporated by

reference in, the August 15, 2006 Prospectus Supplement) made the materially false and

misleading claims, stating, among other things, that:

> [New Century] originate[s] and purchase[s] loans on the basis of the
> borrower's ability to repay the mortgage loan, the borrower's historical
> pattern of debt repayment and the amount of equity in the borrower's
> property, as measured by the borrower's loan-to-value ratio, or LTV.
> [New Century] ha[s] been originating and purchasing sub-prime loans
> since 1996 and believe[s] [it has]  developed a comprehensive and
> sophisticated process of credit evaluation and risk-based pricing  that
> allows us to effectively manage the potentially higher credit risks
> associated with this segment of the mortgage industry.

46.    The August 15, 2006 Prospectus Supplement also contained similar materially

false and misleading language, stating, *inter alia* that:

> [New Century] originate[s] and purchase[s] loans on the basis of the
> borrower's ability to repay the mortgage loan, the borrower's historical
> pattern of debt repayment and the amount of equity in the borrower's
> property, as measured by the borrower's loan-to-value ratio, or LTV.
> [New Century] ha[s] been originating and purchasing sub-prime loans
> since 1996 and believe[s] [it has]  developed a comprehensive and
> sophisticated process of credit evaluation and risk-based pricing.

- 16 -

47.     The August 15, 2006 Prospectus Supplement also explicitly included selected consolidated financial data concerning New Century and taken from its previously reported audited financial results and statements filed with the SEC for each of the fiscal years for the past five year-period, dating back to 2001, including the Company's Annual Report for the fiscal year 2005 and the report on Form 10-Q for the quarter and the six month period ending June 30, 2006, a period covered by New Century's impending restatement announced on February 7, 2007. In this connection, the Prospectus Supplement stated that:

> The following selected consolidated financial data . . . has been derived from our audited financial statements for each of the fiscal years in the five-year period ended December 31, 2005. The financial data for the six months ended June 30, 2006 and 2005 has been derived from our unaudited condensed consolidated financial statements. . . . The following selected consolidated financial data should be read in conjunction with the more detailed information contained in the financial statements and notes thereto for the fiscal year ended December 31, 2005 included in our Annual Report on Form 10-K, which is incorporated by reference into the accompanying prospectus. The following selected consolidated financial data should also be read in conjunction with the more detailed information contained in the financial statements and notes thereto and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" for the six months ended June 30, 2006 and 2005 included in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2006.

48.     The August 15, 2006 Prospectus Supplement also incorporated by reference previously reported information concerning the Company's prior financial results and internal financial and accounting controls, with the "authority" of designated accounting and auditing "EXPERT" KPMG LLP:

> The consolidated financial statements of [New Century] and subsidiaries as of December 31, 2005 and 2004, and for each of the years in the three-year period ended December 31, 2005 and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2005, and the effectiveness of

- 17 -

internal control over financial reporting as of December 31, 2005, have been incorporated by reference herein and in the registration statement of which this prospectus supplement is a part in reliance upon the reports of KPMG LLP, Independent Registered Public Accounting Firm, incorporated by reference herein and upon the authority of said firm as experts in accounting and auditing.

49.    The August 15, 2006 Prospectus Supplement further incorporated by reference a number of other important documents and information.    In that respect, the August 15 Prospectus stated as follows:

> We are "incorporating by reference" certain documents that we file with the [SEC], which means that such documents are considered part of this prospectus supplement and that we can disclose important information to you by referring to those documents. Information that we file in the future with the [SEC] will automatically update and supersede earlier information in or incorporated by reference in this prospectus supplement. . . .
>
> We incorporate herein by reference the documents listed below and any other information we file with the [SEC] under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, including any filings after the date of this prospectus supplement until the offering is completed:
>
> •    our Annual Report on Form 10-K for the fiscal year ended December 31, 2005, filed on March 16, 2006, including those portions incorporated by reference therein of our Definitive Proxy Statement on Schedule 14A, filed on April 4, 2006;
>
> •    our Quarterly Reports on Form 10-Q for the quarter ended March 31, 2006, filed on May 10, 2006, and for the quarter ended June 30, 2006, filed on August 9, 2006;
>
> •    our Current Reports on Form 8-K, filed on January 20, 2006, January 31, 2006, February 2, 2006 (Item 5.02 only), February 3, 2006, February 17, 2006, February 17, 2006, February 28, 2006, March 15, 2006 (Items 1.01, 5.02 and Exhibit 10.1 only), April 4, 2006, April 6, 2006, May 2, 2006, May 11, 2006, May 15, 2006, May 24, 2006, June 9, 2006 (Items 1.02 and 5.02 only), June 15, 2006, June 29, 2006, July 6, 2006 and August 7, 2006;
>
> •    the description of our common stock contained in our Registration Statement on Form 8-A, filed with the Securities and Exchange Commission on September 30, 2004, and any other

- 18 -

amendment or report filed for the purpose of updating such description; and

•       the description of our Series A Preferred Stock, contained in our Registration Statement on Form 8-A, filed with the Securities and Exchange Commission on June 20, 2005, and any other amendment or report filed for the purpose of updating such description.

In addition, we also incorporate by reference into this prospectus supplement additional information that we may subsequently file with the [SEC] under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act prior to the termination of the offering. These documents include Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements.

## The "Incorporated by Reference" Documents - New Century's 2006 Financial Reports

50.     New Century's previously filed financial reports, incorporated by reference in the Series B Preferred Offering documents (as set forth above), reported what the Company had touted in press releases and elsewhere as highly successful, strong and solid financial and operating results. However, these reports were materially false and misleading as to at least the first two quarters of 2006 when the Registration Statement Offering the Series B Preferred Stock became effective and, by the Company's own admission, were virtually worthless and unreliable.

## New Century's First Quarter 2006 Financial Report

51.     New Century filed its Form 10-Q Quarterly Report for the first quarter of 2006 on May 10, 2006. This quarterly report gave New Century's first quarter financial and operating results for the three month period ended March 31, 2006. The Company's quarterly report set forth, *inter alia*, in pertinent part, that:

•       basic earnings per share were $1.82 for the three month period ended March 31, 2006,

- 19 -

- provision for losses on mortgage loans held for investment was $27,825,000 for the three month period ended March 31, 2006,

- as of March 31, 2006, total liabilities were $22,685,337,000

- as of March 31, 2006, residual interests in securitizations were $208,791,000

52.     The First Quarter 2006 Form 10-Q also stated the following, in pertinent part, concerning the Company's compliance with GAAP and its internal controls and procedures:

Basis of Presentation

***

The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X.

***

Controls and Procedures

As of March 31, 2006, the end of our first quarter, our management, including our [CEO, CFO] and President and [COO], has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 1 3a- 15(e) promulgated under the Securities Exchange Act of 1934, as amended.  Based on that evaluation, [these Executive Officers] concluded, as of March 31, 2006, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in [SEC] rules and forms.  There was no change in our internal control over financial reporting during the quarter ended March 31, 2006 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

- 20 -

53.     However, as reported in a February 7, 2007 Form 8-K filed with the SEC, New Century reported that its Board of Directors had concluded on February 7, 2007 that, based upon the recommendation of management, New Century's previously filed financial statement for the quarter ended March 31, 2006, should be restated to correct errors that were discovered in its application of GAAP regarding New Century's allowance for loan repurchase losses. As a result, New Century's previously issued consolidated financial statements for this quarter, as well as all earnings-related press releases for this quarter, should no longer be relied upon. New Century also reported that its methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in the first quarter of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase requests. New Century stated that it was currently evaluating the impact of this matter on its internal control over financial reporting and disclosure controls and procedures for the applicable period. New Century said that it expected to conclude that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006

**New Century's Second Quarter 2006 Financial Report**

54.     New Century filed its Form 10-Q Quarterly Report for the second quarter of 2006 on August 9, 2006. This quarterly report gave New Century's second quarter financial and operating results for the three month period ended June 30, 2006. The Company's quarterly report set forth, inter alia, in pertinent part, that:

- 21 -

- basic earnings per share were $1.85 for the three month period ended June 30, 2006,

- provision for losses on mortgage loans held for investment was $32,325,000 for the three month period ended June 30, 2006,

- as of June 30, 2006, total liabilities were $25,187,094,000

- as of June 30, 2006, residual interests in securitizations were $209,335,000

55.    The Company's Second Quarter 2006 Form 10-Q also stated, in pertinent part, with respect to its GAAP compliance and internal controls and procedures:

Basis of Presentation

* * *

The Company has prepared the accompanying unaudited condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. . . . In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

* * *

Controls and Procedures

As of June 30, 2006, the end of our second quarter, our management, including our Chairman of the Board, President and [CEO and CFO] has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based on that evaluation, [these Directors/Officers] concluded, as of June 30, 2006, that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded,

- 22 -

processed, summarized and reported within the time periods specified in [SEC] rules and forms. There was no change in our internal control over financial reporting during the quarter ended June 30, 2006 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added].

56.     However, as reported in New Century's February 7 Form 8-K, New Century's Board of Directors concluded on February 7, 2007, based upon the recommendation of management, that New Century's previously filed financial statement for the quarter ended June 30, 2006, should be restated to correct errors that were discovered in its application of generally accepted accounting principles regarding New Century's allowance for loan repurchase losses. As a result, New Century's stated that its previously issued consolidated financial statements for this quarter, as well as all earnings-related press releases for this quarter, should no longer be relied upon. New Century also stated that its methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in the second quarter of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase requests.

57.     The February 7, 2007 Form 8-K also stated:

Additionally, New Century establishes an allowance for repurchase losses on loans sold, which is a reserve for expenses and losses that may be incurred by New Century due to the potential repurchase of loans resulting from early payment defaults by the underlying borrowers or based on alleged violations of representations and warranties in connection with the sale of these loans. When New Century repurchases loans, it adds the repurchased loans to its balance sheet as mortgage loans held for sale at their estimated fair values, and reduces the repurchase reserve by the amount the repurchase prices exceed the fair values. During the [second quarter of 2006], New Century 's accounting policies incorrectly applied [SFAS] No. 140 – Accounting for Transfers and Servicing of Financial Assets and

- 23 -

Extinguishment of Liabilities. Specifically, New Century did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses. New Century is currently evaluating the impact of this matter on its internal control over financial reporting and disclosure controls and procedures for the applicable period. New Century expects to conclude that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006.

58.     The Company's Offering Documents referenced above, including the documents incorporated by reference therein, were materially false and misleading, because at the time of the Offering, the Defendants failed to disclose material adverse facts concerning, *inter alia*, the Company's financial and business well-being. Specifically, Defendants failed to disclose at least the following material adverse facts and conditions that threatened the Company's survival and the value of Class members' investments:

(1)     that the Company's reserves for loan losses were grossly insufficient;

(2)     that New Century failed to timely write down for residual interests in securitizations;

(3)     that the Company did not properly account for early-payment default and loan repurchase loss allowances;

(4)     that New Century was operating in an extremely risky and volatile industry without adequate internal and financial or business controls or monitors, and specifically lacked, among other things, any adequate policies, practices, procedures or safeguards for, *inter alia*, properly evaluating the creditworthiness of borrowers or evaluating or managing the increased risks associated with the segments of the mortgage industry in which New Century operated;

(5)     that the Company's financial statements were not prepared in accordance with GAAP;

- 24 -

(6)    the Company's public representations concerning its financial condition, performance and well-being were grossly exaggerated and without any reasonable basis when made; and

(7)    that, as a result of the these and other material omissions and misrepresentations, the Offering Documents were materially false and misleading.

59.    Indeed, the fact that New Century's reported financial results for the first two quarters of 2006 (as well as the third quarter) will be restated, and further that the Company disclosed that these financial statements should not be relied upon is an admission that they were materially false and misleading when originally issued. (APB No.20, ¶¶7-13; SFAS No. 154, ¶25).

**The True State of New Century's Business and Financial Condition and Internal Environment At The Time of the Offering**

60.    Moreover, when the Offering was under way, unbeknownst to the Plaintiff and other Class members, the internal business and financial environment and structure at New Century was actually in a severe state of deterioration.

61.    Former New Century employees both during the relevant time described an environment at the Company of persistent and extremely lax lending guidelines, which were not strengthened until late 2006 and early 2007.  According to these former employees, when these guidelines were finally and belatedly tightened, a "tremendous" decline in loans and loan applications resulted, because more and more potential borrowers no longer qualified under the newly tightened guidelines.

62.    Accordingly, the disclosures at the time of the Offering (in its May 6, 2005 Prospectus, which was attached and incorporated into its August 15, 2006 Prospectus Supplement) that New Century "developed a comprehensive and sophisticated process of credit

- 25 -

evaluation and risk-based pricing that allows us to effectively manage the potentially higher credit risks associated with this segment of the mortgage industry," was materially false and misleading. According to descriptions of former employees of New Century, these purportedly "comprehensive" and "sophisticated" processes were in truth based merely on routine factors such as potential borrowers' credit scores, which were used industry-wide and were in any event routinely disregarded at New Century for the sake of approving otherwise unqualified loans.

63.    Similarly, New Century's claim at the time of the Offering to "originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property, as measured by the borrower's loan-to-value ratio, or LTV" also materially misrepresented the true state of affairs at the Company. Former Company employees reveal that for all practical purposes these were only preliminary criteria, and that sales and volume considerations, and meeting or exceeding quotas, routinely ruled the day at New Century, rather than these publicly disclosed loan evaluation criteria.

***New Century Routinely Violated its Own Lending Criteria in Order to Approve Otherwise Unqualified Loans.***

64.    One former employee, who was with the Company for approximately three years ending in the first quarter of 2005 as Regional Operations Manager (referred to herein as "CW1") and later a Senior Underwriter, and worked at the Company's corporate headquarters in Irvine, California, described an environment at New Century as far back as 2004 in which exceptions to lending guidelines were routinely granted in order to approve otherwise unqualified loans in order to make loan quotas. CW1 described "cronyism and favoritism toward certain brokers" and indicated that New Century often approved loans that should not have been approved.

- 26 -

65.    CW1 also stated with respect to property appraisals, that the Company had an in-house staff of appraisers who reviewed the work of the appraisers hired by outside brokers. However, that internal department would not evaluate or question every appraisal, or apparently even most of them, but only those appraisals that they "thought would raise a red flag."

66.    CW1 stated the use of quotas was widespread at New Century. In fact, as a Regional Operations Manager, CW1 oversaw a staff of approximately 25 employees and stated that he routinely knew whether or not his department met its quota of new loans. In order to make its numbers, the Company would often project the number of loans they thought they could close by a certain time and these aspirations would then be reported as closed deals. This practice of falsely counting loans as "funded" before they actually qualified as such was equivalent to "pulling revenue forward," which created a skewed financial picture of the Company for any given month.

67.    Another former employee who was with the Company for approximately one and one-half years ending in the first quarter of 2006, working as a Funder, an Account Manager, and later an Underwriter (referred to hereinafter as "CW6"), confirmed New Century's employment of lax lending guidelines and business practices and undue focus on volume over loan quality. CW6 stated that at the end of the month, New Century would take anything to get their numbers. In essence they would throw loan applications against the wall and hope that some would stick. CW6 reported that New Century's practice was to approve far more questionable loans approved at end of month in order to make its quotas. CW6 also observed that during his last 6 months of employment, from approximately the fourth quarter of 2005 to the first quarter of 2006, virtually all of the loans seemed to constitute exceptions to the guidelines. CW6 also stated that this was a

- 27 -

national problem, and not a localized problem, and that loans originating in one office would be underwritten at different offices.

68.    CW6 also reported that with regard to the exceptions, it didn't matter whether the problems with a particular loan application were with a particular borrower's credit standards or debt ratio, they found a reason to fund the loan.  During his last 6 months CW6 said that he would underwrite loans and refuse to sign off on them because the quality was so poor, but that many of these loans would nevertheless get approved up the line.

69.    Another former New Century Loan Officer (referred to hereinafter as "CW2") worked in the Company's east coast offices during 2006.  CW2 covered the northeastern United States area and described the Company work environment as one in which talk of production dominated  and lending guidelines were never discussed at meetings.  CW2 stated that it was routine at New Century to stretch or make exceptions to the Company's lending guidelines to qualify borrowers for certain loans who would otherwise have only qualified for smaller loans, or would not have qualified for any loan at all.

70.    CW2 added that New Century was always rolling out new and different programs, such as "Alt-A" for borrowers that didn't fall into traditional lending scenarios.  Alt-A was a program of low or no documentation loans for people with "A" paper or credit but with high debt-to-income ratios.  CW 2 said that the standard for debt-to-income ratios on these types of loans was typically 36 and 28 percent, meaning one had to be at that ratio to be considered a standard A-paper loan.  However, New Century and other sub-prime lenders went as high as a 45 to 50 percent debt-to-income ratio with respect to such loans.

71.    CW2 also described certain other dubious and risky techniques routinely used at New Century to circumvent Company lending guidelines and approve loan applicants who might

- 28 -

otherwise not have qualified. For example, New Century often resorted to refinancing a borrower's existing debt in order to reduce his or her debt-to-income ratio so that he or she qualified for a new and separate New Century loan. For instance, said CW2, an applicant might have a 60 percent debt-to-income ratio, in which case he would not qualify for a loan under New Century's guidelines. However, instead of rejecting that borrower, New Century would refinance his or her existing debt in order to reduce the ratio (perhaps to the 40% range), lowering the borrower's overall monthly payments, and thereby allowing them to qualify for a new, separate New Century loan.

72.     CW2 also stated that while New Century Loan Officers were paid by commission and salary, the salary component was miniscule, and their compensation was mainly commission-based and paid on an ascending scale, meaning that the more loans an officer sold, the higher percentage commission of each loan's fees he or she  received. For instance, according to CW2, loan officers might be paid no commission for the first loan generated (that commission would actually cover operating expenses such as office space), but then receive a 12 percent commission for the second loan; an 18 percent commission for the third loan, and a 36 percent commission for the fourth loan he or she generated, up to as high a 50 percent commission on all fees collected in connection with a particular loan.

73.     The payment of loan officers based overwhelmingly upon incentive commissions, and through this staggered incentive structure which increased the percentage size of the commissions with each loan sold, created the perverse incentive for loan officers to write more, larger and riskier loans with little attention to the quality of the loan issued or the potential borrower. Another Loan Officer who worked for New Century in Morris Plains, New Jersey

during 2005 (hereinafter referred to as "CW3") confirmed this commission-heavy, ascending-percentage compensation structure.

74.     Consistent with undue focus on loan volume generation, CW2 described experiences with the Regional Operations Manager responsible for CW2's Branch Office, who was obsessed with generating volume. According to CW2, this Regional Operations Manager was relentless and only wanted to see results.

75.     Another Loan Officer (referred to herein as "CW4") who worked in the Orange, California offices of New Century subsidiaries Home 123/New Century Financial at the time of the Offering and during the Class Period in 2006, confirmed CW2's reports about New Century's obsessive focus on loan sales and volume. CW4 stated that because of the need to meet quotas, many exceptions were granted to help push the loan volume through. In order to meet these quotas, CW4 reported a belief that New Century in practice often loosened its lending guidelines and approved numerous loans that should not have been approved. CW4 stated that although mortgage loans would technically have to meet certain underlying criteria such as income and debt-to-income ratios, nevertheless exceptions were routinely made in order to gain loan approval.

76.     CW4 stated that New Century branch offices had profit standards by which they had to meet a certain loan volume to be profitable, and upon meeting or exceeding that loan volume they would typically be deemed to have "met budget." In other words, "meeting budget" meant making a profit, as opposed to failing to "meet budget" or being "under budget," which meant that a branch was unprofitable. CW4 also observed that by the time he left the Company in approximately September of 2006 he was told by his Branch Manager and others that few if any of the Company's branches in the area in Southern California were meeting their budget.

- 30 -

CW4 said that he began to notice these problems as early as June 2006, three months before he left the Company, and well before the Offering.

77.     With respect to New Century's purported "sophisticated" and "comprehensive" process of "credit evaluation and risk-based pricing that allow[ed] [New Century] to effectively manage the potentially higher credit risks" in the segment of the mortgage industry in which it worked, former company employees revealed that the methods and processes used by the Company were in truth neither sophisticated nor comprehensive, but rather run-of-the-mill, credit-score based evaluations of potential borrowers that were used industry-wide, and in any event routinely modified or overridden at New Century for the sake of selling more and larger loans to unqualified borrowers.

78.     For instance, according to CW1, everything was credit score and loan-to-value driven, and the size of the loan which a potential borrower received from New Century was routinely stretched beyond what he or she qualified for under his or her particular credit score. For example, if a credit score of 500 to 520 bought you a 70% loan, New Century would make an exception to that. According to CW1, New Century always stretched these tiers. One of the running jokes was -- if nobody else will take it, give it to New Century, they'll make the exception. CW1 recounted  a number of occasions when New Century was accused of granting loans which it knew the borrower could not afford.

79.     CW1 also specifically dismissed the notion that New Century utilized "sophisticated" and "comprehensive" credit evaluation models, stating that New Century used a credit score because the industry itself has used these score based models. CW1 reported that the Company routinely bumped these scores up a tier or even two to qualify potential borrowers for

- 31 -

larger loans, and said he often spent entire days working on nothing but exceptions to loan guidelines.

80.     Importantly, CW1 advised that this was a nationwide problem for New Century and not localized in California, where he was located.

81.     CW1 said that while the Company utilized "front-line initiation" software called FastQual, to which brokers had access, brokers simply fed information into the system to get pre-approval which again was merely based upon routine information such as a potential borrower's credit score. CW1 stated that FastQual was based on the broker's information and once the loan paperwork came in, the Company's guidelines, all he had to do was make a phone call get it done. CW1 said such "tweaking" was routinely approved by managers because of increased commissions and bonuses, and that it was also encouraged by the higher levels of management.

82.     CW1 also stated that management at times even directly instructed him to pump up numbers or relax standards. CW1 reported being overridden in such a manner on many loans with which he was uncomfortable, stating that he would have a stack of approximately 50 loans that he was supposed to look at daily for exceptions and he would refuse to put his name on approximately 10 or 15 of those, and then they would go up to the next level (to the Assistant Vice President/Regional Sales Manager or to the Vice President) and often be approved despite CW1's objection.

## New Century's February 7, 2007 Announcement

83.     After the close of the market on February 7, 2007, New Century disclosed that it would be required to restate its financial results for the first three quarters of 2006. In a press release captioned "New Century Financial Corporation to Restate Financial Statements for the Quarters Ended March 31, June 30 and September 30, 2006," the Company revealed that its

- 32 -

representations during these prior periods concerning, inter alia, the success of its business and financial performance and its financial statements, were in fact materially false and misleading. The February 7, 2007 news release stated, in pertinent part, as follows:

> [New Century] today announced that it will restate its consolidated financial results for the quarters ended March 31, June 30 and September 30, 2006 to correct errors the company discovered in its application of generally accepted accounting principles regarding the company's allowance for loan repurchase losses.
>
> The company establishes an allowance for repurchase losses on loans sold, which is a reserve for expenses and losses that may be incurred by the company due to the potential repurchase of loans resulting from early-payment defaults by the underlying borrowers or based on alleged violations of representations and warranties in connection with the sale of these loans. When the company repurchases loans, it adds the repurchased loans to its balance sheet as mortgage loans held for sale at their estimated fair values, and reduces the repurchase reserve by the amount the repurchase prices exceed the fair values.
>
> During the second and third quarters of 2006, the company's accounting policies incorrectly applied Statement of Financial Accounting Standards No. 140 – Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities. Specifically, the company did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses.
>
> In addition, the company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request.

84.    While the Company attempted to minimize the impact of these glaring severe problems with its previously reported financial results and internal controls, by characterizing its "adjustments" as "generally non-cash," and pointing out the Company's purported $350 million in "cash and excess liquidity" at year-end 2006, the impact of this news was clear, and the

- 33 -

Company admitted that its financial statements for the first three quarters of 2006 and earnings-press releases for those periods could not be relied upon.

85.     The Company also disclosed that it would be forced to reduce net earnings for the first three quarters of 2006, that the release of the Company's fourth quarter and full year 2006 financial results would be delayed indefinitely, and that the problems leading to the restatements constituted "material weaknesses in [the Company's] internal control over financial reporting" for 2006.  The February 7, 2007 release specifically stated that, although the Company's review of the impact of the restatements was continuing:

> at this time the company expects that, once restated, its net earnings for each of the first three quarters of 2006 will be reduced. . . .  the company's previously filed condensed consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 and all earnings-related press releases for those periods should no longer be relied upon. The company expects to file amended Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006 as soon as practicable, with a goal to file by March 1, 2007. The company also expects that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006. . . . The company's fourth quarter and full-year 2006 earnings announcement, originally scheduled for February 8, 2007, has been postponed to an undetermined future date, . . .

86.     Upon the Company's disclosure of the need to restate its 2006 financial results, and its lack of internal financial and accounting controls, the market price of the Company's Series B Preferred shares plunged over 23%, from $24.95 per share on February 7, 2007 to $19.04 several days later on February 12, 2007.

87.     Many analysts reacted harshly to the Company's disclosures. For instance, on the same day New Century made its restatement revelations, JP Morgan analyst Andrew Weisel issued a research report recommending that investors "UNDERWEIGHT" shares of the Company.  Then, on February 8, 2007, Bear Stearns issued an analyst report commenting on

- 34 -

New Century's disclosures, and Bear Stearns Analysts Scott Coren and Michael Nannizzi stated, among other things, that the Company may have understated its loan loss reserves by a staggering $100 to $135 million for the first nine months of 2006.

**Subsequent Events - February/March 2007 - New Century Loses its Credit, and the "New Shade of Blue Chip" Company Declares Bankruptcy**

88.    In the weeks that followed New Century's announcement of its impending restatement on February 7, 2007, its condition and circumstances have continued to spiral downward, emphasizing the significance of the problems faced by the Company as a result of its prior material misrepresentations.

89.    On March 1, 2007, the Company announced its intention to file a Form 12b-25 with the SEC in connection its inability to timely file its annual report on Form 10-K with the SEC.

90.    On March 13, 2007, New Century issued a press release announcing that its stock had been deemed "no longer suitable for listing" and trading in its stock was immediately suspended by the NYSE "based upon the company's recent filings with the [SEC] regarding the uncertainty of its current liquidity position."

91.    The Company's March 13, 2007 press release announced that it was "unable to provide any production volume or capital distribution guidance for 2007," and also announced the  sudden resignation, effective March 7, 2007, of one of New Century's directors, David Einhorn.

92.    Recent news reports also indicate that the Company faces a slew of investigations and other actions into its lending practices as a result of its recent disclosures.  On March 14, 2007, according to a *Reuters* article, the Ohio Attorney General reportedly obtained a court order prohibiting New Century from operating in that state, and specifically preventing it from

- 35 -

soliciting consumers for broker services or mortgage loans, accepting loan applications, or accepting applications for loans and fees to process loans, initiating new foreclosures, pursing pending foreclosures, or evicting consumers, in a lawsuit based upon New Century's alleged violation of Ohio's Consumer Sales Practices Act, Mortgage Loan Act, and Mortgage Brokers Act. The Ohio suit reportedly followed the issuance of cease-and-desist orders by regulators in New York, New Jersey, Massachusetts, and New Hampshire  preventing New Century from taking new loans in those states.

93.     Further, both the SEC and the U.S. Department of Justice have launched investigations into accounting irregularities at New Century.  After the market close on Friday, March 2, 2007, New Century disclosed for the first time that the U.S. Attorney's Office for the Central District of California had notified the Company that it is conducting a criminal inquiry in connection with trading in New Century's stock and that the U.S. Attorney's Office is investigating accounting issues regarding New Century's allowance for loan repurchase losses. The U.S. Attorney's investigation reportedly involved a grand jury subpoena requesting documents in a probe connected to stock trading and accounting errors.

### NEW CENTURY'S VIOLATION OF GAAP RULES
### IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC

94.     The Company's statements concerning its financial results in its Offering Documents at the time of effectiveness of its Series B Preferred stock Offering were materially false and misleading, as such financial information was not prepared in conformity with GAAP. Contrary to the Company's repeated representations, the Company's reported financial results failed to fairly present its operations due to the Company's improper accounting for and disclosure concerning its revenues, in violation of GAAP.

- 36 -

95.     GAAP are principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F .R. § 210.4 01(a) 1)) states that financial statements filed with the SEC but which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures which accompany annual financial statements. 17 C.F.R. § 210.10-01(a).

96.     The fact that New Century's reported financial results for the first three quarters of 2006 will be restated, and further that the Company disclosed that these financial statements should not be relied upon is an admission that they were materially false and misleading when originally issued. (APB No.20, ¶¶7-13; SFAS No. 154, ¶25).

97.     Given these material accounting improprieties, New Century's reported financial results were in violation of GAAP at all relevant times, as well as the following accounting principles:

(1)     The principle requiring that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" (APB No. 28, ¶10);

(2)     The principle requiring that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" (FASB Statement of Concepts No. 1, ¶34);

(3)     The principle requiring that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and

- 37 -

effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, ¶40);

(4)     The principle requiring that "financial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, ¶42);

(5)     The principle requiring that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it." To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(6)     The principle requiring that "financial reporting should be reliable in that it represents what it purports to represent" (FASB Statement of Concepts No. 2, ¶¶ 5 8-59); and

(7)     The principle requiring that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (FASB Statement of Concepts No. 2, ¶79);

(8)     The principle requiring that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered." The best way to avoid injury to investors is to try to ensure that what is reported represents what its purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

98.     The Defendants' failure to disclose the material adverse facts detailed above also violated Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## FIRST CLAIM

## VIOLATION OF SECTION 11 OF THE SECURITIES ACT
## [AGAINST ALL DEFENDANTS]

99.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein, except to the extent that any such allegation may be deemed to sound in fraud.

100.    This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiff and other members of the Class who purchased or otherwise acquired the Company's Series B Preferred stock pursuant to and/or traceable to the Offering of that Preferred Stock against New Century, the Individual Defendants, and the Underwriter Defendants, and were damaged thereby.

101.    As set forth above, the Registration Statement and other Offering Documents, when they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

102.    The Company is the registrant for the Series B Preferred stock sold to Plaintiff and other members of the Class. The Company issued, caused to be issued and participated in the issuance of materially false and misleading written statements and/or omissions of material facts to the investing public that were contained in the Registration Statement and other Offering documents as set forth herein.

103.    The Individual Defendants, either personally or through an attorney-in-fact, signed the Registration Statement and/or were Directors or persons performing similar functions for the Company at the time of the Offering.

104.    The Underwriter Defendants are liable as underwriters in connection with the Offering.

- 39 -

105.    The Defendants named in this Claim are liable to Plaintiffs and other members of the Class who purchased or otherwise acquired shares of the Company's Series B Preferred stock pursuant and/or traceable to the Offering.

106.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Company's Series B Preferred stock pursuant to and/or traceable to the Offering are entitled to damages pursuant to Section 11.

107.    This Claim was brought within one year after discovery of the untrue statements and omissions in the Offering Documents, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the Company's Series B Preferred stock was first bona fide offered to the public.

108.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not materially misleading.

109.    At the times of purchase of New Century Series B Preferred stock, the Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

## SECOND CLAIM
### VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### [AGAINST THE INDIVIDUAL DEFENDANTS]

110.    Plaintiff repeats and realleges the allegations set forth above in the First Claim as if set forth fully herein, except to the extent that any such allegation may be deemed to sound in fraud.

- 40 -

111.    This Claim is brought against the Individual Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired the Company's Series B Preferred stock pursuant and/or traceable to the Offering.

112.    The Company is liable under Section 11 of the Securities Act as set forth in the First Claim herein with respect to the Offering.

113.    Each of the Individual Defendants was a control person of the Company with respect to the Offering by virtue of that individual's position as a senior executive officer and/or director of the Company.

114.    The Individual Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company as well as the contents of the Registration Statement and other Offering Documents at the time of the Offering. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other Offering Documents had the ability to either prevent their issuance or cause them to be corrected.

115.    As a result, the Individual Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

116.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Issuer's Series B Preferred stock pursuant and/or traceable to the Offering are entitled to damages against the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

- 41 -

(i)      declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the FRCP;

(ii)     awarding Plaintiff and other members of the Class damages together with interest thereon;

(iii)    awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(iv)     awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

Plaintiff hereby demands a trial by jury on the issues so triable.

Dated:  April 10, 2007                     Respectfully submitted,

                                           MILBERG WEISS & BERSHAD LLP

                                           By: _____
                                           Peter G. A. Safirstein (PS 6176)
                                           Kent A. Bronson (KB 4906)
                                           Roland Riggs (RR 1695)
                                           One Pennsylvania Plaza
                                           New York, NY  10119-0165
                                           Telephone: (212) 594-5300
                                           Facsimile: (212) 868-1229

                                           *Attorneys for Plaintiff and the Class*

- 42 -

## CERTIFICATE OF SERVICE

I, the undersigned, declare:

1.       That declarant is and was, at all times herein mentioned, I am employed in the County of New York, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One Pennsylvania Plaza, 49th Floor, New York, New York 10119.

2.       That on April 10, 2007, declarant served the CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITES LAWS by causing to deposit a true copy thereof in a United States mailbox at New York, New York in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.       That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of April, 2007, at New York, New York.

_____
SHEILA FEERICK

- 43 -

## NEW CENTURY FINANCIAL CORPORATION

### Service List

*Attorneys for Plaintiffs*

Laurence D. Paskowitz
**Paskowitz and Associates**
60 East 42nd Street, 46th Floor
New York, NY  10016
Telephone:  (212) 685-0969
Facsimile:  (212) 685-2306

Lionel Z. Glancy
Michael M. Goldberg
Peter A. Binkow
**Glancy Binkow and Goldberg**
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

Nancy Kaboolian
**Abbey Gardy**
212 E. 39th Street
New York, NY  10016
Telephone:  (212) 889-3700
Facsimile:  (212) 684-5191

Roy L. Jacobs
**Roy Jacobs and Associates**
60 East 42nd Street, 46th Floor
New York, NY  10165
Telephone:  (212) 685-0969
Facsimile:  (212) 504-8386

Catherine J. Kowalewski
Darren J. Robbins
David C. Walton
**Lerach Coughlin Stoia**
 **Geller Rudman & Robbins**
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423

- 44 -

Arthur L. Shingler, III
Nicholas J. Licato
**Scott + Scott**
600 B. Street, Suite 1500
San Diego, CA  92101
Telephone:  (619) 233-4565
Facsimile:  (619) 233-0508

David R. Scott
**Scott + Scott**
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432

Joseph W. Cotchett
Steven N. Williams
**Cotchett Pitre and McCarthy**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

Frederick W. Gerkens, III
John Halebian
**Lovell Steward Halebian**
500 Fifth Avenue, 58th Floor
New York, NY  10110
Telephone:  (212) 608-1900
Facsimile:  (212) 719-4677

Bruce G. Murphy
**Law Office of Bruce G. Murphy**
265 Llwyds Lane
Vero Beach, FL  32963
Telephone:  (516) 231-4202
Facsimile:  (772) 234-6608

Jeffrey P. Campisi
Joel B. Strauss
**Kaplan Fox and Kilsheimer**
805 Third Avenue, 22nd Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

Laurence D. King
**Kaplan Fox and Kilsheimer**
555 Montgomery Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 772-4700
Facsimile: (415) 772-4707

Lori S. Brody
**Kaplan Fox and Kilsheimer**
1801 Century Park East, Suite 1460
Los Angeles, CA 90067
Telephone: (310) 785-0800
Facsimile: (310) 785-0897

Evan J. Smith
Steven S. Wang
**Brodsky & Smith, L.L.C.**
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8425
Facsimile: (310) 247-0160

Maya Saxena
Joseph E. White, III
**Saxena White**
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3082

Larry A. Sackey
**Larry A. Sackey Law Offices**
11500 W. Olympic Boulevard, Suite 550
Los Angeles, CA 90064
Telephone: (310) 575-4444
Facsimile: (310) 575-4520

- 46 -

Henry H. Rossbacher
James S. Cahill
**Rossbacher Firm**
811 Wilshire Boulevard, Suite 1650
Los Angeles, CA  90017-2666
Telephone:  (213) 895-6500
Facsimile:  (213) 895-6161

Robert S. Green
**Green Welling**
595 Market Street, Suite 2750
San Francisco, CA  94105
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710

Thomas Glenn Martin
**Thomas Glenn Martin Law Offices**
One World Trade Center, Suite 800
Long Beach, CA  90831
Telephone:  (562) 208-9088
Facsimile:  (562) 684-0882

David A.P. Brower
**Brower Piven**
488 Madison Avenue
New York NY  10002
Telephone:  (212) 501-9000
Facsimile:  (212) 501-0300

Daniel Bernard Scotti
**Dreier LLP**
499 Park Avenue
New York, NY 10022
Telephone:  (212) 328-6100
Facsimile:  (212) 328-6101

John C. Kirkland
**Dreier Stein and Kahan**
North Tower
1620 26th Street, 6th Floor
Santa Monica, CA 90404
Telephone:  (424) 202-6050
Facsimile:  (424) 202-6250

- 47 -

Michael R. Reese
**Gutride Safier**
230 Park Avenue, Suite 963
New York, NY 10169
Telephone:  (212) 579-4625
Facsimile:  (212) 253-4272

Francis M. Gregorek
Marisa C. Livesay
Betsy C. Manifold
Rachele R. Rickert
**Wolf Haldenstein Adler Freeman & Herz**
Symphony Tower
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  (619) 239-4599
Facsimile:  (619) 234-4599

Klari Neuwelt
**Klari Neuwelt Law Offices**
110 East 59th Street, 29th Floor
New York, NY 10022
Telephone:  (212) 593-8800
Facsimile:  (212) 593-9131

Amir Stark
Lee Albert
**Mager and Goldstein LLP**
1650 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone:  (215) 640-3280
Facsimile:  (215) 640-3281

Jayne A. Goldstein
**Mager and Goldstein**
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone:  (954) 515-0123
Facsimile:  (954) 515-0124

- 48 -

Karen Hanson Riebel
Richard A. Lockridge
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2159
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Carolyn G. Anderson
**Zimmerman Reed**
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) _____

Blake M. Harper
Jennifer A. Kagan
**Hulett Harper Stewart LLP**
550 West C. Street, Suite 1600
San Diego, CA 92101
Telephone: (619) 338-1133

James E. Miller
Patrick A. Klingman
**Shepherd Finkelman Miller and Shah, LLC**
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120

Nathan Zipperian
James C. Shah
**Shepherd Finkelman Miller and Shah, LLC**
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883

- 49 -

Michael D. Braun
**Braun Law Group**
12400 Wilshire Blvd., Suite 920
Los Angeles, CA 90025
Telephone:  (310) 442-7755
Facsimile:  (310) 442-7756

Alan Berg
**Alan Berg Law Offices**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone:  (818) 788-8300


Douglas M. Risen
Sherrie R. Savett
**Berger & Montague, P.C.**
1622 Locust Street
Philadelphia, PA 19103-6365
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

Elaine T. Byszewski
**Hagens Berman Sobol Shapiro LLP**
700 South Flower Street, Suite 2940
Los Angeles, CA 90017-4101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152

Reed R. Kathrein
**Hagens Berman Sobol Shapiro LLP**
425 Second Street, Suite 500
San Francisco, CA 94107
Telephone:  (415) 896-6300
Facsimile:  (415) 896-6301

Steve W. Berman
**Hagens Berman Sobol Shapiro LLP**
1301 5th Ave., Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Koji F. Fukumura                              *Attorneys for Defendants*
Philip C. Tencer
William E. Grauer
**Cooley Godward Kronish**
4401 Eastgate Mall
San Diego, CA  92121-1909
Telephone:  (858) 550-6000
Facsimile:  (858) 550-6420

- 51 -

## CERTIFICATION OF NAMED PLAINTIFF

I, Jay Peter Kaufman, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification on behalf of the purchasers of the subject securities described herein (including, as the case may be, myself, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. I will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all my transactions in 9.75% Series B Cumulative Redeemable Preferred Stock(NYSE: NEW Pr B) **DURING** the Class Period specified in the complaint as follows:

| 9.75% Series B Cumulative Redeemable Preferred Stock | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share ($) |
|---|---|---|---|---|
| | SEE ATTACHED | | | |
| | | | | |

These securities were acquired or held in (check all that apply):

☐ General (non-retirement account)     ☐ Merger/acquisition/distribution     ☐ Gift
☐ IRA                                  ☐ Employer-sponsored plan (401k, 403b, etc.)

8. During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws except as described below (if any):

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this _____ 5ᵗʰ _____ day of ___ April _____ , 2007

_____
Jay Peter Kaufman

**Schedule A**

**Jay Peter Kaufman TTEE Jay Peter Kaufman Revocable Trust**
**New Century Financial Corp. Preferred Series B 9.75%**

|  | DATE | SHARES | COST |
|---|---|---|---|
| Purchase(s): | | | |
| | 10/5/2006 | 1,200 | 25.2000 |
| | 10/5/2006 | 3,000 | 25.2500 |
| | 10/5/2006 | 5,000 | 25.2500 |
| | 11/1/2006 | 3,000 | 25.0500 |
| | 11/6/2006 | 800 | 25.2400 |
| | 11/6/2006 | 1,200 | 25.2800 |
| | 11/6/2006 | 3,500 | 25.3200 |
| | 11/6/2006 | 12,300 | 25.2500 |

April 10, 2007

        This document is intended to certify that I, Jay Peter Kaufman, have signed the required Certifications in the matters of *The Jay Peter Kaufman Revocable Trust, et al v. New Century Financial Corp., et al.* in my capacity as trustee of the Jay Peter Kaufman Revocable Trust.

_____
Jay Peter Kaufman
Trustee, the Jay Peter Kaufman Revocable Trust