1  LIONEL Z. GLANCY
2  PETER A. BINKOW
   MICHAEL GOLDBERG                    2007 FEB -8 PM 3: 31
3  GLANCY BINKOW & GOLDBERG LLP
4  1801 Avenue of the Stars, #311
   Los Angeles, CA 90067
5  Telephone:  (310) 201-9150
6  Facsimile:  (310) 201-9160
7  E-mail:     info@glancylaw.com

8  NANCY KABOOLIAN
9  ABBEY SPANIER RODD ABRAMS & PARADIS, LLP
   212 East 39th Street
10 New York, New York 10016
11 Telephone:  (212) 889-3700
12 Facsimile:  (212) 684-5191
   E-mail:     nkaboolian@abbeyspanier.com
13
14 Attorneys for Plaintiff Avi Gold
   [Additional Counsel on Signature Page]
15
16          **UNITED STATES DISTRICT COURT**
17          **CENTRAL DISTRICT OF CALIFORNIA**

18 ┌─────────────────────────────────┬──────────────────────────
19 │ AVI GOLD, Individually           │ CIVIL ACTION
   │ and on Behalf of All Others Similarly │ CV07-00931 DDP
20 │ Situated,                        │ CASE NUMBER _____
21 │                                  │
22 │              Plaintiff,          │ CLASS ACTION COMPLAINT
   │                                  │ FOR VIOLATION OF FEDERAL
23 │         vs.                      │ SECURITIES LAWS
24 │                                  │
25 │ BRAD A. MORRICE, TAJ S. BINDRA,  │
   │ ROBERT K. COLE, PATTI M. DODGE,  │
26 │ NEW CENTURY FINANCIAL CORP.,     │
27 │         Defendants.              │ JURY TRIAL DEMANDED
28 └─────────────────────────────────┘

                         1                  ORIGINAL

Plaintiff, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by New Century Financial Corporation ("New Century Financial" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of securities analysts' reports concerning; (c) review and analysis of press releases and media reports issued by and disseminated by New Century Financial; and (d) review of other publicly available information concerning New Century Financial.

1.    This is a class action against New Century Financial and certain of its officers and directors for violation of the federal securities laws. Plaintiff brings this action on behalf of himself and all other persons or entities, except for Defendants and certain of their related parties as described below, who purchased New Century Financial securities (the "Class") during the period May 4, 2006 through February 7, 2007, inclusive (the "Class Period").

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and 1367, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa).

3.    This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

4.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District, and the Company maintains its principal executive offices in this District.

5.    In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

6.    Plaintiff Avi Gold purchased New Century Financial common stock during the Class Period, as set forth in the certification attached hereto.

7.    Defendant New Century Financial was founded in 1995 and headquartered in Irvine, California. New Century Financial is a real estate investment trust (REIT) and one of the nation's premier mortgage finance companies, providing mortgage products to borrowers nationwide through its operating subsidiaries, New Century Mortgage Corporation and Home123 Corporation. The company offers a broad range of mortgage products designed to meet the needs of all borrowers

8.    Brad A. Morrice was at all times relevant President and Chief Executive Officer and Director of New Century Financial.

9.    Defendant Taj S. Bindra, Executive Vice President and Chief Financial Officer of New Century Financial.

10.    Defendant Robert K. Cole was at all times relevant Chairman of the Board from December 1995 through December 2006 of New Century Financial.

11.    Defendant Patti M Dodge was the Company's Chief Financial Officer until August 2006.

12.    By virtue of their high level positions with the Company, defendants directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Defendants were involved in drafting, producing,

3

reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or deliberately disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

13.    As officers and directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange, and governed by the provisions of the federal securities laws, the Defendants had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. Defendant's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.    Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein, and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Defendants had access to the adverse, undisclosed information about the Company's operations, the financial condition and performance of the Company as particularized herein and knew (or deliberately disregarded) that these adverse facts rendered the positive representations made by or about New Century Financial and its business issued or adopted by the Company materially false and misleading.

15.    Defendants were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company

4

1   during the Class Period. Defendants were provided with copies of the documents
2   alleged herein to be misleading prior to or shortly after their issuance and/or had
3   the ability and/or opportunity to prevent their issuance or cause them to be
4   corrected. Accordingly, Defendants are responsible for the accuracy of the public
5   reports and releases detailed herein and are therefore primarily liable for the
6   representations contained therein.

7       16.    Defendants are liable as a participant in a wrongful scheme and course
8   of business that operated as a fraud or deceit on those who purchased or otherwise
9   acquired New Century Financial common stock during the Class Period by
10  disseminating materially false and misleading statements and/or concealing
11  material adverse facts. The scheme deceived the investing public regarding New
12  Century Financial business, operations, and the intrinsic value of the Company's
13  common stock, and caused plaintiff and other members of the Class to purchase
14  New Century Financial common stock at artificially inflated prices.

15  **CLASS ACTION ALLEGATIONS**

16      17.    Plaintiff brings this as a class action pursuant to Federal Rule of Civil
17  Procedure 23(a) and (b)(3) on behalf of all persons who purchased New Century
18  Financial securities during the Class Period. Excluded from the Class are
19  Defendants, officers and directors of the Company, members of the immediate
20  families of the Defendant New Century Financial and their legal representatives,
21  heirs, successors or assigns and any entity in which any he has or has had a
22  controlling interest.

23      18.    This action is properly maintainable as a class action because:

24      a.    the members of the proposed Class in this action are dispersed
25  throughout the United States and are so numerous that joinder of all Class
26  members is impracticable. While the exact number of Class members is unknown
27  to Plaintiff at this time and can only be ascertained through appropriate discovery,
28  Plaintiff believes that Class members number in the thousands. Millions of New

1   Century Financial shares were traded publicly on the New York Stock Exchange

2   under the symbol "NEW". As of October 31, 2006 had 55,470,607 shares of

3   common stock outstanding.

4         b.    Plaintiff's claims are typical of those of all members of the

5   Class because all have been similarly affected by Defendants' actionable conduct

6   in violation of federal securities laws as alleged herein;

7         c.    Plaintiff will fairly and adequately protect the interests of the

8   Class and has retained counsel competent and experienced in class action

9   litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class

10  that Plaintiff seeks to represent;

11        d.    A class action is superior to other available methods for the fair

12  and efficient adjudication of the claims asserted herein because joinder of all

13  members is impracticable. Furthermore, because the damages suffered by

14  individual members of the Class may be relatively small, the expense and burden

15  of individual litigation make it virtually impossible for Class members to redress

16  the wrongs done to them. The likelihood of individual Class members prosecuting

17  separate claims is remote;

18        e.    Plaintiff anticipates no unusual difficulties in the management

19  of this action as a class action; and

20        f.    the questions of law and fact common to the members of the

21  Class predominates over any questions affecting individual members of the Class.

22      Among the questions of law and fact common to the Class are:

23        i.    whether Defendants' acts and/or omissions as alleged

24  herein violated the federal securities laws;

25        ii.    whether the Company's Class Period public statements

26  and filings misrepresented and/or omitted material facts;

27        iii.    whether Defendants acted with knowledge or with

28  reckless disregard for the truth in misrepresenting and/or omitting material facts;

6

1            iv.    whether Defendants participated in and pursued the

2    common course of conduct complained of herein;

3            v.    whether the market price of New Century Financial

4    securities was inflated artificially as a result of Defendants' material

5    misrepresentations and/or omissions during the Class Period; and

6            vi.    to what extent the members of the Class have sustained

7    damages and the proper measure of damages.

8    ## SUBSTANTIVE ALLEGATIONS COMMON TO ALL COUNTS

9        19.    On April 7, 2006 New Century Financial announced total loan

10   production for the first quarter 2006 and provided the date for its first quarter 2006

11   results announcement. The press release stated in part as follows:

12   > We are off to a strong start this year with $13.4 billion in total loan

13   > production for the first quarter of 2006. We are particularly pleased to

14   > have achieved a 31 percent increase in total loan production over the

15   > first quarter of 2005, with approximately 14 percent coming from

16   > organic growth in our non- prime division. While the weighted

17   > average coupon on our non-prime product decreased modestly to 8.4

18   > percent for March 2006 compared with the previous month, we are on

19   > track to meet our profit margin target due in part to tighter credit

20   > spreads and lower loan acquisition costs," said Robert K. Cole,

21   > Chairman of the Board and Chief Executive Officer. "We are pleased

22   > to see signs of a more favorable secondary market for our loans, as we

23   > have successfully entered into forward-sale commitments through

24   > June 2006 with gain-on-sale executions above 102.

25

26       20.    On May 4, 2006, New Century Financial reported its financial

27   results for the three months ended March 31, 2006. The May 4, 2006 press

28   release stated in part as follows:

7

First Quarter 2006 Highlights

Earnings-per-share (EPS) of $1.79

REIT taxable income(1) of $1.78 per share fully covered the corresponding dividend of $1.75 per share

After-tax return on equity(2) was 19.5 percent

Securitized $1.7 billion of mortgage loans at the REIT

Total loan production was $13.4 billion in the first quarter 2006 and $4.7 billion in April 2006

Maintained non-prime loan acquisition costs (LAC) at 1.66 percent

Reaffirms 2006 dividend guidance of $7.30 per share

Financial Results

"We achieved strong first quarter 2006 results highlighted by 21 percent growth in EPS, a 17 percent increase in REIT taxable income, and 31 percent growth in mortgage loan production compared with the same period last year," said Robert K. Cole, Chairman and Chief Executive Officer. "We are also pleased to have maintained low loan acquisition costs, achieved our targeted net operating margin range for the quarter, and added mortgage loans to our REIT portfolio, which will contribute to our ability to pay our projected dividend of $7.30 per share for 2006."  The company reported net earnings of $103.7 million, or $1.79 per share, for the first quarter of 2006, compared with $84.8 million, or $1.48 per share, for the same period in 2005. The year-over-year increase in net earnings was primarily attributable to the growth in mortgage loan production volume and greater contributions to net earnings from the company's REIT portfolio.

8

Mortgage Loan Portfolios

During the first quarter of 2006, the company completed two securitizations structured as financings totaling $1.7 billion in mortgage loans at the REIT, including one securitization consisting solely of $0.3 billion of second lien collateral. Substantially all of the collateral in the $0.3 billion securitization represents second mortgage loans originated in connection with the company's 80/20-mortgage product. "We believe the securitization of second trust deeds allowed us to capture the full economic value of that particular pool of loans," said Kevin M. Cloyd, President of NC Capital Corporation, the company's secondary marketing subsidiary. "The remaining $1.4 billion of mortgage loans securitized was representative of our core non-prime mortgage loan production and received favorable credit enhancement from rating agencies as a result of lower loss coverage requirements."

At March 31, 2006, the balance of the REIT mortgage loan portfolio was $14.1 billion and the balance of the taxable REIT subsidiary (TRS) mortgage loan portfolio was $2.1 billion. The allowance for losses on loans held for investment was $186.0 million and $23.8 million for the REIT and TRS portfolios, respectively, representing 1.32 percent and 1.14 percent of the unpaid principal balance of the respective portfolios. This compares with 1.23 percent and 1.22 percent of the unpaid principal balance of the respective portfolios at December 31, 2005. Delinquency rates as of March 31, 2006 and actual losses to date in the company's REIT and TRS portfolios continue to be significantly lower than historical experience. The company's 60-plus day delinquency rates as of March 31, 2006 were 4.46 percent at the REIT and 4.78 percent at the TRS. While actual

losses to date have been significantly lower than the company's expectations, the company continues to build its allowances for loan losses based on various factors, which include seasoning of the portfolios, as well as overall economic and market conditions.

Mortgage Loan Production by Channel – Non-Prime, Prime and Alt-A The company originates and purchases mortgage loans through two channels -- Wholesale and Retail. The Wholesale channel originates and purchases mortgage loans through a network of independent mortgage brokers and correspondent lenders solicited by its Account Executives. The company's Retail channel originates mortgage loans directly through its 240 branch offices and its central telemarketing unit, as well as through relationships that are referred or solicited through builders and realtors.

Total Mortgage Loan Production

Total mortgage loan production for the first quarter of 2006 was $13.4 billion, a 31 percent increase over the same period a year ago. "Our key objectives this year include maximizing the capabilities of the prime and Alt-A platform we acquired in 2005 for future growth and utilizing that acquisition as a catalyst for expanding the mortgage products we offer through each of our delivery channels," said Brad A. Morrice, Vice Chairman, President and Chief Operating Officer. "This quarter's mortgage loan production results were enhanced by $1.9 billion in prime and Alt-A originations and we expect to see even stronger results as we continue the expansion of our product lines across all channels."

Total mortgage loan production for April 2006 was approximately $4.7 billion, or $0.235 billion in average daily volume, including $4.0 billion of Wholesale mortgage loan production and $0.7 billion of

10

Retail mortgage loan production. This compares with $4.5 billion, or $0.214 in average daily volume, for April 2005. The weighted average coupon for non-prime production in April 2006 was 8.5 percent.

"Earlier this week, we announced that Anthony T. (Tony) Meola has joined the company as Executive Vice President, Loan Production. Tony will be responsible for managing and expanding our production franchise, broadening our product menu and increasing productivity. He brings with him a breadth and depth of knowledge of the mortgage industry and a passion for constant improvement. We look forward to his contribution to our continued growth and success," said Mr. Morrice.

Wholesale Channel

In the first quarter of 2006, the company originated $11.4 billion in loans through its Wholesale channel, representing a 25 percent increase over the first quarter of 2005. "The growth in Wholesale mortgage loan production was the result of the superior efforts of our top-tier Account Executives. As a result, I'm proud to report that our Wholesale business ranked as the #1 non-prime wholesale lender and #4 wholesale lender in the overall mortgage market in 2005," said Mr. Morrice.

In February 2006, the company purchased Access Lending Corporation's platform that provides warehouse lines of credit to middle-market residential-mortgage bankers. "This acquisition enables us to offer warehouse lending services to our Wholesale customers. We are excited about entering this growing market," said Mr. Cloyd.

Retail Channel

The company's Retail channel originated approximately $2.0 billion in loans in the first quarter of 2006, compared with $1.2 billion in the year ago quarter. The 75 percent increase in Retail mortgage loan production was primarily the result of the addition of the origination platform that the company acquired from RBC Mortgage in September 2005.

TRS Operating Results -- Non-Prime Gain-on-Sale

In the first quarter of 2006, the company sold $11.2 billion of non-prime loans at a gain-on-sale of 1.67 percent. Gain-on-sale decreased four basis points from 1.71 percent for the fourth quarter of 2005 as a result of loans sold in the first quarter of 2006 pursuant to forward-sale commitments entered into during the fourth quarter of 2005, when the secondary market was very weak. However, gain-on-sale progressively improved during each of the months in the first quarter of 2006. Continuing this trend, the company expects non-prime gain-on-sale to improve in future quarters of 2006 based on stronger secondary market demand for its product and forward-sale commitments extending into the third quarter of 2006.

LAC

First quarter 2006 LAC of 1.66 percent was effectively unchanged compared with the fourth quarter of 2005 despite the seasonal decrease in mortgage loan production volume. The operating expense component of LAC increased nine basis points and was offset by an eight basis point decrease in the points and fees component. "We are particularly pleased that we were able to maintain our loan acquisition costs at this low level given the decrease in mortgage loan production that typically occurs in the first quarter of the year," said Patti M. Dodge, Executive Vice President and Chief Financial Officer.

1    Net Operating Margin

2    "Our net operating margin was 50 basis points for the first quarter of

3    2006, which was in-line with our previously announced guidance

4    range. Given our forward-sale commitments and focus on maintaining

5    low loan acquisition costs, we expect our net operating margin will

6    improve in the second quarter of 2006 to a range of 60 to 75 basis

7    points," said Ms. Dodge.

8    TRS Operating Results -- Prime and Alt-A

9    In the first quarter of 2006, the company closed $2.0 billion in loans

10    through the prime and Alt-A mortgage loan origination platform and

11    acted as a broker for an additional $0.3 billion to third parties. The

12    results from this platform were a $0.8 million loss for the quarter,

13    which is a significant improvement over the $4.3 million loss in the

14    previous quarter. "We are pleased to see such progress as we fully

15    integrate this mortgage loan origination platform and we continue to

16    believe this business is well positioned to be accretive to EPS in

17    2006," continued Mr. Morrice.

18    The company has provided the gain-on-sale, LAC and net operating

19    margin of these operations in tables set forth later in this press release.

20    2006 Outlook

21    "Our strategic objectives for 2006 include achieving consistently

22    strong operating performance in both our REIT and TRS, broadening

23    the mortgage products and services available through each of our

24    delivery channels, and lowering costs while increasing productivity,"

25    said Mr. Morrice. "We are already making great progress toward

26    achieving each of these objectives.

27        21.    On May 10, 2006, New Century Financial filed with the SEC its Form

28    10-Q for the first quarter ending March 31, 2006.  Defendants Cole, Morrice and

Dodge each signed certifications pursuant to Securities Exchange Act Rule 13A – 14 and 15D – 14 Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, and Certification Pursuant to 18 U.S.C Section 1350, falsely certifying that they reviewed the Form 10-Q; that the report did not contain any untrue statements of material fact; and that the financial statements fairly presented in all material respects the financial condition, results or operations and cash flows of the Company

22.    The Company's press release and Form 10-Q for the first quarter ended March 31, 2006 was materially false and misleading because New Century Financial did not properly account for some of the home loans it had to buy back. Like many mortgage lenders, New Century Financial does not keep its loans; it sells the loans to banks and investors. The deals normally have clauses allowing investors to force New Century Financial to buy back a loan if the borrower misses an early payment. Defendants knew but failed to properly account for the home loans the Company had to buy back.  Defendants knew that more investors would sell back loans because loan repurchases surged throughout 2006 amid payment defaults

23.    On July 6, 2006, New Century Financial announced that defendant Morrice had transitioned to the role of Chief Executive Officer effective July 1, 2006 and will continue to serve as Vice Chairman and President of the company. New Century announced this transition in February 2006. Defendant Morrice succeeds defendant Cole, who will continue to serve the company as Chairman of the Board of Directors.

24.    On July 10, 2006, New Century announced second quarter 2006 total loan production of $16.2 billion, representing a 21 percent increase over the same period a year ago.  The July 10, 2006 press release stated in part as follows:

> June 2006 total loan production of $6.0 billion increased 9 percent compared with May 2006 and brought second quarter total loan

14

production to $16.2 billion," said Brad A. Morrice, Vice Chairman, President and Chief Executive Officer, who transitioned into this new role on July 1, 2006. "The weighted average coupon for our June non-prime production was 8.4 percent, which reflects an increased amount of higher credit grade non-prime production. Additionally, we have raised the coupon on our non-prime loans by 15 basis points over the past few weeks.

We expect that our continued cost reductions and enhanced secondary marketing execution during the second quarter have improved our non-prime net operating margin over the first quarter of 2006. As such, we expect our non-prime net operating margin to be within the recently increased guidance range of 75 basis points to 85 basis points for the second quarter of 2006," concluded Mr. Morrice.

25.    On August 3, 2006, New Century Financial reported results for the three and six months ended June 30, 2006.

Second Quarter 2006 Results and Highlights

Earnings-per-share (EPS) of $1.81

REIT taxable income(1) per share of $1.40

Total mortgage loan production of $16.2 billion; total loan production for July 2006 of approximately $5.3 billion

Non-prime net operating margin increased to 1.01 percent

Non-prime loan acquisition costs (LAC) decreased to 1.51 percent

Prime/Alt-A platform achieved profitability

After-tax return on equity(2) was 19.8 percent

Board declared third quarter dividend of $1.85 per share

Reaffirmed 2006 dividend guidance of $7.30 per share

Chief Financial Officer Patti M. Dodge to transition to newly created executive role when successor is in place

"Our second quarter results are evidence of the strength and stability of our franchise," said Brad A. Morrice, President and Chief Executive Officer. "We achieved the second highest quarterly loan production volume in our history, while substantially improving our operating margin over the first quarter in a challenging environment. As a result, our second quarter net earnings were $105.5 million, or $1.81 per share, an 11 percent increase in net earnings compared with the second quarter of 2005. These results are particularly impressive considering that we only sold or securitized 82 percent of the loans we originated in the second quarter, increasing loans held for sale by $3.0 billion. These loans are covered by forward sales commitments with premiums in excess of 102, so we expect to realize the related earnings in the third quarter."

Mortgage Loan Portfolios

During the second quarter of 2006, the company completed $1.7 billion in securitizations structured as financings at the REIT level, including the company's first Alt-A loan securitization of $0.5 billion and a $1.2 billion securitization of non-prime product. "The Alt-A transaction enhanced our secondary market execution and diversified our REIT portfolio of mortgage loans with a new asset class," said Kevin M. Cloyd, President of NC Capital Corporation, the company's secondary marketing subsidiary.

At June 30, 2006, the balance of the mortgage loan portfolio was $16.0 billion. The allowance for losses on loans held for investment was $209.9 million, representing 1.31 percent of the unpaid principal balance of the portfolio. This compares with 0.79 percent of the

unpaid principal balance of the portfolio at June 30, 2005 and 1.30 percent of the portfolio at March 31, 2006. Delinquency rates as of June 30, 2006 in the company's portfolio continue to be significantly lower than historical experience. The company's 60-plus day delinquency rate as of June 30, 2006 was 4.61 percent compared with 4.50 percent in the previous quarter. The company's 2005 and 2006 vintages are experiencing more normalized delinquency trends than the 2003 and 2004 vintages, which have performed exceptionally well when compared with historical experience. "We are comfortable with our current loan loss reserve levels, which take into consideration not only normal portfolio seasoning but also our higher cumulative loss expectations for the newer vintages," said Patti M. Dodge, Executive Vice President and Chief Financial Officer.

REIT portfolio income declined to $52.0 million in the second quarter of 2006 compared with $83.3 million in the first quarter. REIT portfolio income was $79.2 million in the second quarter of 2005. The sequential decrease in REIT portfolio income is primarily the result of a lower return-on-assets ("ROA") in the second quarter when compared to the first quarter. ROA declined to 1.49 percent in the second quarter from 2.34 percent in the first quarter as a result of a decrease in interest spread attributable to portfolio seasoning and the expected spread compression that comes with such seasoning. In addition, the company's shift in 2006 to embedding swaps in its securitization transactions, which results in a more level yield over the life of the transaction, also led to a decrease in interest spread. Lower prepayment income, hedge re-balancing gains and income from hedge ineffectiveness and other derivative instruments also had a significant impact on ROA.

17

Mortgage Loan Production by Channel -- Non-Prime, Prime and Alt-A

The company originates and purchases mortgage loans through two channels - Wholesale and Retail. The Wholesale channel originates and purchases mortgage loans through a network of independent mortgage brokers and correspondent lenders solicited by its Account Executives. The company's Retail channel originates mortgage loans directly through its 246 branch offices and its central telemarketing unit, as well as through relationships that are referred or solicited through builders and realtors.

Total Mortgage Loan Production

Total mortgage loan production for the second quarter of 2006 was $16.2 billion, a 20 percent increase over the same period a year ago and a 21 percent increase over the first quarter of 2006. Excluding the prime and Alt- A loan origination platform that was acquired in the third quarter of 2005, second quarter loan production increased 5 percent year-over-year. For the quarter, the company's Wholesale channel originated $13.8 billion of mortgage loans and the Retail channel originated $2.4 billion. "We are pleased with the second quarter's strong loan production volume, which resulted from modest growth in our core non-prime product coupled with the addition of our Prime and Alt-A products," said Mr. Morrice. "Additionally, we introduced a new credit grade during the quarter that serves borrowers with qualifications between Alt-A and non-prime. We believe this AAA credit grade is rapidly gaining acceptance in the market place."

Total mortgage loan production for July 2006 was approximately $5.3 billion, including $4.6 billion of Wholesale mortgage loan production

and $0.7 billion of Retail mortgage loan production. This compares with $4.6 billion for July 2005.

TRS Operating Results -- Non-Prime Gain-on-Sale

In the second quarter of 2006, the company sold $10.3 billion of non-prime loans, or 73 percent of the quarter's non-prime production, at a gross premium of 2.31 percent and a net gain-on-sale of 2.10 percent. Second quarter net gain-on-sale increased by 43 basis points compared with 1.67 percent for the first quarter as a result of improved secondary market execution, which was primarily driven by a higher weighted average coupon on the company's loans, a more favorable product mix and stronger secondary market appetite, partly offset by increases in swap rates that outpaced coupon growth. Additionally, second quarter net gain-on-sale included 9 basis points of unanticipated hedging gains.

Loan Acquisition Costs (LAC)

Second quarter 2006 LAC was 1.51 percent compared with 1.66 percent in the previous quarter. The 15 basis point decline was primarily a result of the operating expense component of LAC declining 17 basis points, slightly offset by a modest increase in the points and fees component.

"In the current environment, we believe it is becoming increasingly important to be a low-cost originator," continued Ms. Dodge. "Our record low LAC of 1.51 percent is evidence of our ability to use our size and scale to increase efficiencies and leverage fixed costs, which we believe is a distinct competitive advantage. I'm pleased that during a quarter in which loan production increased 22 percent, our cost controls kept expense growth to only 11 percent compared with the first quarter of 2006."

Net Operating Margin

The company's net operating margin for its non-prime loans improved to 1.01 percent in the second quarter of 2006 from 50 basis points in the first quarter of 2006. "We are proud to have made such a significant improvement in our non-prime net operating margin this quarter," said Ms. Dodge. "We will continue to focus on reducing our LAC, but expect our operating margins to be negatively impacted on a go-forward basis by as much as 10 basis points as a result of the recent Standard and Poor's ABS model changes."

TRS Operating Results -- Prime and Alt-A

In the second quarter of 2006, the company closed $2.1 billion in loans through its prime and Alt-A mortgage loan origination platform and acted as a broker for an additional $0.2 billion to third parties. The company has provided the gain-on-sale, LAC and net operating margin of these operations in tables set forth later in this press release.

"Consistent with our projections, our prime and Alt-A business became profitable in the second quarter and reported a net operating margin of 53 basis points," said Mr. Morrice. "This quarter's net operating margin was higher than we anticipated as a result of hedging gains and pair-off fees. A more typical net operating margin for our prime and Alt-A platform is expected to be in the range of 15 to 20 basis points."

26.    On August 9, 2006, New Century Financial filed with the SEC its Form 10-Q for the Second quarter ending June 30, 2006.    Defendants Cole, Morrice and Dodge each signed certifications pursuant to Securities Exchange Act Rule 13A – 14 and 15D – 14 Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, and Certification Pursuant to 18 U.S.C Section 1350, falsely certifying that they reviewed the Form 10-Q; that the report did not contain any

20

1 | untrue statements of material fact; and that the financial statements fairly presented
2 | in all material respects the financial condition, results or operations and cash flows
3 | of the Company.

4 |    27.    The Company's press release and Form 10-Q for the second quarter
5 | ended June 30, 2006 was materially false and misleading because New Century
6 | Financial did not properly account for some of the home loans it had to buy back.
7 | Like many mortgage lenders, New Century Financial does not keep its loans; it
8 | sells the loans to banks and investors. The deals normally have clauses allowing
9 | investors to force New Century Financial to buy back a loan if the borrower misses
10 | an early payment. Defendants knew but failed to properly account for the home
11 | loans the Company had to buy back.  Defendants knew that more investors would
12 | sell back loans because loan repurchases surged throughout 2006 amid payment
13 | defaults

14 |    28.    On August 16, 2006, New Century announced that it has priced a
15 | public offering of 2 million shares of 9.75% Series B Cumulative Redeemable
16 | Preferred Stock at $25 per share. The net proceeds from the offering will be used
17 | for general corporate purposes, including, without limitation, repurchases of the
18 | company's common stock under its stock repurchase program and investments in
19 | the company's on-balance sheet portfolio of mortgage assets.

20 |    29.    On September 13, 2007, New Century Financial announced that the
21 | Company has completed a $50 million private placement of trust preferred
22 | securities through its wholly-owned subsidiary, New Century Capital Trust I. The
23 | proceeds from the private placement will be used for general corporate purposes,
24 | including, without limitation, repurchases of the company's common stock under
25 | its stock repurchase program and investments in the company's on-balance sheet
26 | portfolio of mortgage assets.  The $50 million of trust preferred securities have an
27 | approximate 30-year term ending September 30, 2036.

28 |

30.    On November 2, 2006, New Century Financial reported its financial results for the three and nine months ended September 30, 2006.

Highlights

Earnings-per-share (EPS) was $1.12

REIT taxable income(1) per share was $0.84

Total mortgage loan production was $15.8 billion

Non-prime net operating margin was 0.52 percent

Record low non-prime loan acquisition costs (LAC) of 1.49 percent

After-tax return-on-equity(2) was 12.7 percent

Announces acquisition of Irwin Mortgage Corporation's servicing operations

Raised $107 million in gross proceeds of perpetual preferred and trust preferred capital

Declared fourth quarter dividend of $1.90 per share; results in total 2006 dividends of $7.30 per share

Appointed Taj S. Bindra as Executive Vice President and Chief Financial Officer

Announces updated financial and secondary market strategy

Expects to distribute $400 million or more to stockholders in 2007 through a combination of dividends and common stock repurchases

Third Quarter 2006 Results

"Current conditions in our industry are clearly challenging," said Brad A. Morrice, President and Chief Executive Officer. "In this context,

22

while our $1.12 quarterly EPS reflects a year-over-year and sequential decline, it is important to point out that a significant item negatively impacting our EPS was a $0.75 per share reduction from marking-to-market our derivatives not qualifying for hedge accounting treatment. Notwithstanding the current quarter's impact, we believe our hedging strategies are effective on an economic basis.

"Excluding the hedging-related accounting charges, our operating results were solid. As expected, we maintained loan production volume at a level comparable to the previous quarter, achieved record low loan acquisition costs, and improved portfolio interest spread before the impact of hedging during the third quarter. Partially offsetting these positive trends, gain- on-sale declined as a result of increased rating agency credit enhancement levels and higher loan repurchases and discounted loan sales," said Mr. Morrice.

Gain-on-Sale

Loan Sales - In the third quarter of 2006, the company sold $13.9 billion of non-prime loans at a gross premium of 2.25 percent compared with $9.9 billion at a gross premium of 2.33 percent in the second quarter of 2006. Additionally, the company sold $410.0 million of non-prime mortgage loans during the third quarter of 2006 at an average discount of 12.9 percent of their outstanding principal balances compared with $415.1 million for the second quarter of 2006 at an average discount of 5.0 percent. While the total volume of discounted loans sales decreased slightly, the severity of the discount increased due to the inclusion of a higher percentage of non-performing assets in these sales and a lower average price for loans with minor defects. Higher loan repurchases and discounted mortgage loan sales reduced the gain-on-sale margin by 48 basis points.

"We expect the volume of discounted loan sales and the severity of the discount to continue to challenge originators in this industry," said Mr. Cloyd. "Loan buyers have become more vigilant, increasing the number of loan files reviewed in their due diligence process and decreasing the percentage of loans they ultimately purchase. In addition, loan repurchases have increased as a result of higher early payment defaults. While we expect this industry trend to continue in the near-term, we believe our additional underwriting guidelines and continual focus on process improvement will help mitigate this trend."

Impact of Forward Sale Commitments and Rate Locks –

The accounting impact of the value of the company's forward sale commitments and interest rate locks, which are treated as derivative instruments for accounting purposes but do not currently qualify for hedge accounting, reduced gain-on-sale by an additional 18 basis points for a net gain-on-sale of 1.59 percent. Because these derivatives do not qualify for hedge accounting, the current accounting rules require that the company mark-to-market forward sale commitments without a corresponding offset to its mortgage loans or pipeline. Such marks can be positive or negative to earnings depending on interest rates outstanding at the end of the quarter. These mark-to-market adjustments reverse in the period in which the sale settles.

Loan Acquisition Costs (LAC)

Third quarter 2006 LAC was 1.49 percent of non-prime production volume, which is a record low for the company and compares with 1.51 percent of non- prime production volume in the second quarter of 2006. "We are pleased with our success in managing our costs on a dollar basis and as a percentage of loans originated," said Patti M. Dodge, Executive Vice President and Chief Financial Officer. "We

24

1   have kept corporate and support headcount relatively flat since the

2   beginning of 2005, and as a result, do not expect any across- the-board

3   headcount reductions. However, we will continue to manage

4   headcount in accordance with our productivity metrics. We will also

5   continue our other cost reduction efforts, which we believe can lead to

6   significant further cost reductions. In the current environment, low

7   loan acquisition costs are one of the keys to profitable operations and

8   we have among the lowest costs in the non-prime sector."

9

10   31.    On November 9, 2006, New Century Financial filed with the SEC its

11   Form 10-Q for the third quarter ending September 30, 2006. Defendants Cole,

12   Morrice and Dodge each signed certifications pursuant to Securities Exchange Act

13   Rule 13A – 14 and 15D – 14 Adopted Pursuant to Section 302 of the Sarbanes-

14   Oxley Act of 2002, and Certification Pursuant to 18 U.S.C Section 1350, falsely

15   certifying that they reviewed the Form 10-Q; that the report did not contain any

16   untrue statements of material fact; and that the financial statements fairly presented

17   in all material respects the financial condition, results or operations and cash flows

18   of the Company.

19   32.    The Company's press release and Form 10-Q for the third quarter

20   ended September 30, 2006 was materially false and misleading because New

21   Century Financial did not properly account for some of the home loans it had to

22   buy back. Like many mortgage lenders, New Century Financial does not keep its

23   loans; it sells the loans to banks and investors. The deals normally have clauses

24   allowing investors to force New Century Financial to buy back a loan if the

25   borrower misses an early payment. Defendants knew but failed to properly account

26   for the home loans the Company had to buy back. Defendants knew that more

27   investors would sell back loans because loan repurchases surged throughout 2006

28   amid payment defaults

1    33.    On November 17, 2006, New Century Financial reported that the

2    Company has completed a $35 million private placement of trust preferred

3    securities through its wholly-owned subsidiary, New Century Capital Trust II. The

4    proceeds from the private placement will be used for general corporate purposes,

5    including, without limitation, repurchases of the company's common stock under

6    its stock repurchase program and investments in the company's on-balance sheet

7    portfolio of mortgage assets.

8    34.    On January 8, 2007, New Century Financial announced that total

9    mortgage loan production for 2006 reached a new record high of $59.8 billion,

10    which is 6.6 percent higher than the $56.1 billion originated in 2005. Additionally,

11    loan production for December 2006 was $4.8 billion, representing a 9.4 percent

12    decrease compared with December 2005 and a 6.7 percent increase compared with

13    November 2006. The weighted average coupon for the company's non-prime loan

14    production remained at 8.3 percent for December 2006, unchanged from the prior

15    month.

16    35.    Defendant Morrice was quoted as stating"

17        We are pleased to have delivered another year of record loan

18        production and profitable market share growth given the turbulent

19        market environment. Our solid results for the year reflect a modest

20        decline in our non-prime production, offset by the expansion of prime

21        and Alt-A originations. For 2007, we expect our overall mortgage loan

22        production to be relatively flat compared with 2006 as we anticipate a

23        decline in market volume and the impact of our tighter underwriting

24        guidelines to be offset by the continued roll-out of our Alt-A and prime

25        products and additional market share growth for our non-prime

26        products.

27    36.    On February 7, 2007 New Century Financial announced that it will

28    restate its consolidated financial results for the quarters ended March 31, June 30

and September 30, 2006 to correct errors the company discovered in its application of generally accepted accounting principles regarding the company's allowance for loan repurchase losses. The Press Release stated as follows:

> The company establishes an allowance for repurchase losses on loans sold, which is a reserve for expenses and losses that may be incurred by the company due to the potential repurchase of loans resulting from early-payment defaults by the underlying borrowers or based on alleged violations of representations and warranties in connection with the sale of these loans. When the company repurchases loans, it adds the repurchased loans to its balance sheet as mortgage loans held for sale at their estimated fair values, and reduces the repurchase reserve by the amount the repurchase prices exceed the fair values. During the second and third quarters of 2006, the company's accounting policies incorrectly applied Statement of Financial Accounting Standards No. 140 - Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities. Specifically, the company did not include the expected discount upon disposition of loans when estimating its allowance for loan repurchase losses.
>
> In addition, the company's methodology for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request.
>
> Importantly, the foregoing adjustments are generally non-cash in nature. Moreover, the company had cash and liquidity in excess of $350 million at December 31, 2006.

27

1    Although the company's full review of the legal, accounting and tax
2    impact of the restatements is ongoing, at this time the company
3    expects that, once restated, its net earnings for each of the first three
4    quarters of 2006 will be reduced.

5    In light of the pending restatements, the company's previously filed
6    condensed consolidated financial statements for the quarters ended
7    March 31, June 30 and September 30, 2006 and all earnings-related
8    press releases for those periods should no longer be relied upon. The
9    company expects to file amended Quarterly Reports on Form 10-Q for
10    the quarters ended March 31, June 30 and September 30, 2006 as soon
11    as practicable, with a goal to file by March 1, 2007. The company also
12    expects that the errors leading to these restatements constitute material
13    weaknesses in its internal control over financial reporting for the year
14    ended December 31, 2006. However, the company has taken
15    significant steps to remediate these weaknesses and anticipates
16    remediating them as soon as practicable.

17    The company's fourth quarter and full-year 2006 earnings
18    announcement, originally scheduled for February 8, 2007, has been
19    postponed to an undetermined future date, which will follow the
20    company's filing of its amended Quarterly Reports on Form 10-Q for
21    the quarters ended March 31, June 30 and September 30, 2006.

22    Fourth Quarter 2006 Developments

23    The increasing industry trend of early-payment defaults and,
24    consequently, loan repurchases intensified in the fourth quarter of
25    2006. The company continued to observe this increased trend in its
26    early-payment default experience in the fourth quarter, and the
27    volume of repurchased loans and repurchase claims remains high.

28

In addition, the company currently expects to record a fair value adjustment to its residual interests to reflect revised prepayment, loss and discount rate assumptions with respect to the loans underlying these residual interests, based on indicative market data. While the company is still determining the magnitude of these adjustments to its fourth quarter 2006 results, the company expects the combined impact of the foregoing to result in a net loss for that period.

37.    On this news Shares of New Century Financial plummeted 35 percent to closed at $19.28 with 25 million shares traded.

38.    New Century Financial did not properly account for some of the home loans it had to buy back. Like many mortgage lenders, New Century Financial does not keep its loans; it sells the loans to banks and investors. The deals normally have clauses allowing investors to force New Century Financial to buy back a loan if the borrower misses an early payment. Defendants knew but failed to properly account for the home loans the Company had to buy back. Defendants knew that more investors would sell back loans because loan repurchases surged throughout 2006 amid payment defaults.

39.    In addition, defendants knew that any repurchased loans would be less valuable. Loan repurchases are bad for mortgage lenders because few investors would sell back a loan unless it lost value. Piper Jaffray analyst Robert Napoli said a repurchased loan has typically lost 15 percent to 20 percent of its value.

## Applicability Of Presumption Of
## Reliance:  Fraud-On-The-Market Doctrine

35.    The market for New Century Financial securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, New Century Financial securities traded at artificially inflated prices during the Class Period. Plaintiff and

29

1  other members of the Class purchased or otherwise acquired New Century
2  Financial securities relying upon the integrity of the market price of New Century
3  Financial securities and market information relating to New Century Financial, and
4  have been damaged thereby.

5      36.    During the Class Period, defendants materially misled the investing
6  public, thereby inflating the price of New Century Financial securities, by publicly
7  issuing false and misleading statements and omitting to disclose material facts
8  necessary to make defendants' statements, as set forth herein, not false and
9  misleading. Said statements and omissions were materially false and misleading in
10 that they failed to disclose material adverse information and misrepresented the
11 truth about the Company, its business and operations, as alleged herein.

12     37.    At all relevant times, the material misrepresentations and omissions
13 particularized in this Complaint directly or proximately caused or were a
14 substantial contributing cause of the damages sustained by plaintiff and other
15 members of the Class. As described herein, during the Class Period, defendants
16 made or caused to be made a series of materially false or misleading statements
17 about New Century Financial's business, prospects and operations. These material
18 misstatements and omissions had the cause and effect of creating in the market an
19 unrealistically positive assessment of New Century Financial and its business,
20 prospects and operations, thus causing the Company's securities to be overvalued
21 and artificially inflated at all relevant times. Defendants' materially false and
22 misleading statements during the Class Period resulted in plaintiff and other
23 members of the Class purchasing the Company's securities at artificially inflated
24 prices, thus causing the damages complained of herein

25     38.    At all relevant times, the market for New Century Financial securities
26 was an efficient market for the following reasons, among others:

27          (a)    on the NYSE, a highly efficient and automated market;

28

30

(b)    As a regulated issuer, New Century Financial filed periodic public reports with the SEC and the NYSE;

(c)    New Century Financial regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    New Century Financial was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

39.    As a result of the foregoing, the market for New Century Financial's securities promptly digested current information regarding New Century Financial from all publicly available sources and reflected such information in New Century Financial's stock price.  Under these circumstances, all purchasers of New Century Financial's securities during the Class Period suffered similar injury through their purchase of New Century Financial's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### For Violations of Sections 10(b) of

### The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder

40.    Plaintiff repeats and realleges paragraphs 1 through 30, as if set forth fully herein.

41.    In connection with the sale of New Century Financial securities throughout the Class Period, Defendants participated, directly or by acquiescence, despite a duty to act, in the preparation and/or issuance of materially false and misleading statements and omissions.

31

42.     Defendants knew, or were reckless in not knowing, that the statements contained in New Century Financial public filings were materially false and misleading.   Plaintiff and the Class relied, directly or indirectly by reliance on the integrity of the market, on Defendants' misstatements and/or omissions and were damaged as a result.   But for Defendants' misrepresentations and/or omissions, Plaintiff and the Class would not have purchased New Century Financial securities or would have purchased them at non-artificially inflated prices.

## COUNT II

### For Violation Of Section 20(a) Of The Exchange Act
### (Against the Section 20(a) Defendants, as defined below)

43.     Plaintiff repeats and realleges each of the preceding paragraphs 1 through 33 as if fully set forth herein.

44.     This claim is brought against Defendant New Century Financial.

45.     The Section 20(a) Defendants were control persons within the meaning of the Exchange Act.

46.     As set forth above, Defendant New Century Financial violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this complaint.   By virtue of his positions as control persons, the Section 20(a) Defendant New Century Financial violated Section 10(b) and Rule 10b-5, are liable pursuant to Section 20(a) of the Exchange Act.

32

1    47.    As a direct and proximate result of the Section 20(a) Defendant New

2  Century Financial wrongful conduct, Plaintiff and the Class suffered damages in

3  connection with their purchases of the Company's securities during the Class

4  Period.

5                              **NO SAFE HARBOR**

6    48.    The statutory safe harbor provided for forward-looking statements

7  under certain circumstances does not apply to any of the allegedly false statements

8  pleaded in this Complaint.   The statements alleged to be false and misleading

9  herein all relate to then-existing facts and conditions.   In addition, to the extent

10  certain of the statements alleged to be false may be characterized as forward

11  looking, they were not identified as "forward-looking statements" when made,

12  there was no statement made with respect to any of those representations forming

13  the basis of this Complaint that actual results "could differ materially from those

14  projected," and there were no meaningful cautionary statements identifying

15  important factors that could cause actual results to differ materially from those in

16  the purportedly forward-looking statements.   In the alternative, to the extent that

17  the statutory safe harbor is intended to apply to any forward-looking statements

18  pleaded herein, Defendants are liable for those false forward-looking statements

19  because at the time each of those forward-looking statements was made, the

20  speaker had actual knowledge that the forward-looking statement was materially

21  false or misleading, and/or the forward-looking statement was authorized or

22  approved by an executive officer of New Century Financial who knew that the

23  statement was false when made.

24                           **PRAYER FOR RELIEF**

25    **WHEREFORE**, Plaintiff, on behalf of himself and all other Class members,

26  prays for judgment as follows:

27    A.    A determination that this action is a proper class action and a

28  certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.    An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants for damages sustained as a result of Defendants' wrongdoing, including interest thereon;

C.    An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other disbursements; and

D.    A grant of such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:        February 8, 2007

**GLANCY BINKOW & GOLDBERG LLP**

LIONEL Z. GLANCY #134180
MICHAEL GOLDBERG #188669
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:  (310) 201-9150

**ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**
Nancy Kaboolian,
212 East 39th Street
New York, New York 10016
Tele:  (212) 889-3700
Fax:  (212) 684-5191

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PASKOWITZ & ASSOICATES**
Laurence D. Paskowitz, Esq.
Roy L. Jacobs, Esq
60 East 42nd Street, 46th Floor
New York, New York 10016
Tel: (212) 685-0969
Fax: (212) 685-2306

**Attorneys for Plaintiff Avi Gold**

## PLAINTIFF'S CERTIFICATE

The undersigned ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint against New Century Financial Corp. ("NEW") and certain of its officers and directors.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiffs counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.    Plaintiff made the following  transactions during the Class Period (in the common shares of NEW:

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 9 Jan. 07 | 75 | 29.75 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

6.    During the three years prior to the date of this Certification, Plaintiff has not moved to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.    I declare under penalty of perjury, this  day of February, 2007 that the information above is accurate.

Avi Gold